IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL ACTION

TOBY MARTINI; SARA OSLEY;
STEVEN FARROW; ROSE BILAL;
EUGENE TORNAMBE; DEIDRE MURPHY;
JEFFREY COOPER; CARLOS FERNANDEZ;
KELLY DIXON; ROBERT WALLEND;
DAVID KINGSLEY; DANIEL PILOSENO;
JAVIER AGUDELO-MEZA;
JUHYUN CHO; JENNNIFER ISLER;
GRETA DOBKIN; GINA LEONARD;
SHAWN KAPLAN; WILLIAM KIRSCHBAUM;
SOUNE PHENGPHONGSAVANH;
KAREN THOMPSON; RANDY BELL;
MADELYN CASIANO; LUIS TORRES;
MICHELL CASTRO; MARY FALZONE;
ROBERT CONNER; SCOTT GALLADAY;
CYNTHIA CARISEO; MICHAEL G ALPINE;
JOELLE VANDI; CHARLES DUNN;
DAVID SCAMARD; BRYAN CORNELL;
HALA ABELAZIN; KIMBERLY TANSINO;
LYNN O.VALENTIN;
    Plaintiff(s),

vs.

COUNTRYWIDE FINANCIAL
CORPORATION, a Delaware corporation;
COUNTRYWIDE HOME LOANS, INC.,
a New York corporation; FULL SPECTRUM
LENDING, INC., a California Corporation;
ANGELO MOZILO, an individual; DAVID
SAMBOL, an individual; and DOES 1-260,
Inclusive, ET. AL.,
    Defendant(s).

_____/

**CASE NO.:**
**DIVISION:**     09  03591

**DIVISION G**
FILED

FEB  4 2009

CLERK OF CIRCUIT COURT
CIRCUIT CIVIL DEPT.

## COMPLAINT

TABLE OF CONTENTS
I.      NATURE OF THE CASE
II.     PARTIES AND VENUE
III.    DEFENDANTS BUSINESS ACTS AND PRACTICES
IV.     THE PRIMARY PURPOSE OF DEFENDANTS' DECEPTIVE BUSINESS PRACTICES
        WAS TO MAXIMIZE PROFITS FROM THE SALE OF LOANS TO THE SECONDARY
        MARKET
V.      COUNTRYWIDE ENGAGED IN DECEPTIVE PRACTICES IN THE SALE OF
        COMPLEX AND RISKY LOANS TO CONSUMERS
        *A.     The Pay Option ARM*
        *B.     Hybrid ARM Loans*

1

         *(i)    2/28 and 3/27 ARMs*
         *(ii)   5/1, 7/1, and 10/1 ARMs*
         *(iii)  Countrywide's Deceptive Marketing of its Hybrid ARMs*
       *C.     Home Equity Lines of Credit*

**VI.**    **COUNTRYWIDE EASED AND DISREGARDED UNDERWRITING STANDARDS IN ORDER TO INCREASE ITS MARKET SHARE.**
       *A.     Countrywide' Low- and No-Documentation Loans*
       *B.     Countrywide's Easing of Underwriting Standards*
       *C.     Countrywide's Exception" Underwriting Compromised Standards*
       *D.     Countrywide's Risk-Layering and Pressure to Sell "Piggyback" Loans Further Loosened Underwriting Practices*

**VII.**   **COUNTRYWIDE ENGAGED IN DECEPTIVE MARKETING PRACTICES TO SELL INCREASING NUMBERS OF LOANS**
       *A.     Countrywide Deceptively Lulled Borrowers Into Believe That it Was a "Trusted u Advisor" Looking Out for the Borrowers' Best Interests*
       *B.     Countrywide Encouraged Serial Refinancing*
       *C.     Countrywide Misled Borrowers About the True Terms of Pay Option and Hybrid ARM Loans by Focusing the Borrowers' Attention on Low Beginning Payments and Teaser Rates*
       *D.     Countrywide Misled Borrowers About their Ability to Refinance Before The Rates or Payments on Their Pay Option and Hybrid ARMs Increased*
       *E.     Countrywide Misled Borrowers About the Cost of Reduced and No Document Loans*
       *F.     Countrywide Misled Borrowers Regarding the Terms of HELOCs*

**VIII.**  **IN ORDER TO INCREASE MARKET SHARE, DEFENDANTS CREATED A HIGH-PRESSURE SALES ENVIRONMENT WHERE EMPLOYEES WERE REWARDED FOR SELLING AS MANY LOANS AS THEY COULD, WITHOUT REGARD TO BORROWERS' ABILITY TO REPAY**

**IX.**    **AS PART OF ITS DECEPTIVE SCHEME, COUNTRYWIDE COMPENSATED ITS BUSINESS PARTNER BROKERS AT A HIGHER RATE FOR MORE PROFITABLE LOANS, WITHOUT CONSIDERATION OF SERVICES ACTUALLY PROVIDED BY THE BROKERS**

**X.**     **COUNTRYWIDE'S DECEPTIVE AND MISLEADING FORM 10-K FILINGS**

**XI.**    **AS A RESULT OF DEFENDANTS' DECEPTIVE SCHEME, PLAINTIFF AND THOUSANDS OF FLORIDA HOMEOWNERS HAVE EITHER LOST THEIR HOMES OR FACE FORECLOSURE AS THE RATES ON THEIR ADJUSTABLE RATE MORTGAGES RESET**

**COUNT I- VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**COUNT II- INTENTIONAL FRAUDULENT MISREPRESENTATION AND IDUCEMENT**
**COUNT III- NEGLIGENT FRAUDULENT MISREPRESENTATION AND IDUCEMENT**
**COUNT IV- BREACH OF FIDUCIARY DUTY**
**COUNT V- INVASION OF PRIVACY**
**COUNT VI- UNJUST ENRICHMENT**
**DEMAND FOR JURY TRIAL**

COMES NOW Plaintiff(s), Toby Martini; Sara Osley; Steven Farrow; Rose Bilal; Eugene Tornambe; Diane Murphy; Jeffrey Cooper; Carlos Fernandez; Kelly Dixon; Robert Wallend; David Kingsley; Daniel Piloseno; Javier Agudelo-Meza; Juhyun Cho; Jennnifer Isler; Greta Dobkin; Gina Leonard; Shawn Kaplan; William Kirschbaum; Soune Phengphongsavanh; Karen Thompson; Randy Bell; Madelyn Casiano; Luis Torres; Michell Castro; Mary Falzone; Robert Conner; Scott Galladay; Cynthia Cariseo; Michael G Alpine; Joelle Vandi; Charles Dunn; David Scamard; Bryan Cornell; Hala Abelazin; Robert Tansino; Lynn O. Valentin ("Plaintiff"),

by and through the undersigned counsel, and hereby files this Amended Complaint against Defendant(s), COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a New York corporation; FULL SPECTRUM LENDING, INC., a California Corporation; ANGELO MOZILO, an individual; DAVID SAMBOL, an individual; and DOES 1-260, inclusive, and states as follows:

## I.   NATURE OF THE CASE

1.       This is a cause of action against, COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a New York corporation; FULL SPECTRUM LENDING, INC., a California Corporation; ANGELO MOZILO, an individual; DAVID SAMBOL, an individual; and DOES 1-260, inclusive, as well as further related entities that may arise during discovery, seeking to recover damages for deception, misrepresentation, false, misleading and unconscionable statements and practices in connection with generating large numbers of mortgage loans for resale on the secondary mortgage market.  In doing so, the Defendants named herein purportedly originated loans with no due diligence and accepted applications which were patently fraudulent and reflected no ability on the part of the borrowers to make the required payments, and in doing so the Countrywide Defendant's named herein targeted Plaintiff(s) and Florida's consumers by the brokers who knew the Countrywide Defendant's named herein would write these mortgages.  Furthermore, the Countrywide Defendants named herein hid any potentially negative effects of "teaser" loans, including rising rates, prepayment penalties and negative amortization, which borrowers would inevitably face if they were making minimum payments or trying to refinance.  The Countrywide Defendants named herein offered reduced or no documentation loan programs to increase its loan sales, and also allegedly paid greater compensation to brokers for loans with higher interest rates and prepayment penalties because it could sell those loans for higher prices on the secondary market.  In furtherance of its efforts to generating large numbers of mortgage loans for resale on the secondary mortgage market, the Countrywide Defendants named herein employed deceptive marketing practices designed to sell costly loans while hiding or misrepresenting the terms and dangers.  Such deceptive sales practices resulted in a large number of loans ending in default and foreclosure, damages to Plaintiff(s). This action is brought on behalf of all consumers in Florida and elsewhere similarly situated who suffered damages as a result of the conduct and Defendants described herein.

## II.   PARTIES AND VENUE

2.       At all relevant times, Plaintiff resided in the State of Florida, and entered

into a consumer loan transaction wherein Plaintiff(s) borrowed moneys from Countrywide, and in exchange executed and delivered a Promissory Note ("Mortgage Note") and a Mortgage ("Mortgage") securing the payment of the Mortgage Note. The Mortgage Notes and Mortgages encumber the real and personal property ("Property") described therein located in the State of Florida, then owned by and in possession of Plaintiff. It is believed that Countrywide may be in possession of all original Mortgage Notes and Mortgages.

3.      At all relevant times, defendant Countrywide Financial Corporation ("CFC"), a Delaware corporation, has transacted and continues to transact substantial business throughout the State of Florida, including in Hillsborough County.   CFC has numerous subsidiaries that originate, purchase, securitize, sell and service residential and commercial loans; provide loan closing services such as credit reports, appraisals and flood determinations; conduct fixed income securities underwriting and trading activities; provide property, life and casualty insurance; and manage a captive mortgage reinsurance company. At all relevant times, CFC owns and operates its wholly owned subsidiary Countrywide Home Loans, Inc. At all relevant times, CFC owned and operated its wholly owned subsidiary Full Spectrum Lending, Inc.  At all relevant times, CFC conducted substantial substantial business in the State of Florida and Hillsborough County, and committed the acts and/or omissions which are the subject of this cause of action through Countrywide Home Loans, Inc. and/or Full Spectrum Lending, Inc. At all relevant times, CFC controlled and/or otherwise directed the operations of Countrywide Home Loans, Inc. and Full Spectrum Lending, Inc.

4.      At all relevant times, defendant Countrywide Home Loans, Inc. ("CHL"), a New York corporation, has transacted and continues to transact substantial business throughout the State of Florida, including in Hillsborough County.  CHL is a subsidiary of CFC. Since May 15, 1969, CHL has been a registered foreign corporation in the State of Florida.  Subsequent to May 15, 1969 and continuing to the present, CHL has been doing substantial business in the State of Florida, including Hillsborough County.

5.      At all relevant times, Full Spectrum Lending, Inc. ("Full Spectrum"), was a California corporation that transacted substantial business throughout the State of Florida, including in Hillsborough County, and was a subsidiary of CFC. On or about December 15, 2004, Full Spectrum was merged into and became a division of CHL. Prior to April 28, 2005, Full Spectrum was a Florida registered foreign corporation. On or about April 28, 2005, Full Spectrum withdrew as a registered foreign corporation in the State of Florida.  Subsequent to April 28, 2005 and continuing to the present, CHL has been doing substantial business in the State of Florida and Hillsborough County  through a Full Spectrum.  For all conduct that occurred

4

on or after December 15, 2004, any reference in this complaint to CHL includes reference to its Full Spectrum division.

6.    Defendants CFC, CHL, and Full Spectrum are referred to collectively herein as "Countrywide" or "the Countrywide Defendants."

7.    At all relevant times, defendant Angelo Mozilo ("Mozilo") was Chairman and Chief Executive Officer of CFC.  Defendant Mozilo directed, authorized, and ratified the conduct of the Countrywide Defendants set forth herein.

8.    At all relevant times, defendant David Sambol ("Sambol") is and was the President of CHL and, since approximately September, 2006, has served as the President and Chief Operating Officer of CFC. Sambol directed, authorized and ratified the conduct of CHL, and after, September, 2006, the Countrywide Defendants, as set forth herein.

9.    Plaintiff is not aware of the true names and capacities of the defendants sued as Does 1 through 260, inclusive, and therefore sues these defendants by such fictitious names. Each of these fictitiously named defendants is responsible in some manner for the activities alleged in this Complaint.  Plaintiff will amend this Complaint to add the true names of the fictitiously named defendants once they are discovered.

10.    The defendants identified in paragraphs 3 through 8, above, shall be referred to collectively as "Defendants."

11.    Whenever reference is made in this Complaint to any act of any defendant(s), that allegation shall mean that each defendant acted individually and jointly with the other Defendants.

12.    Any allegation about acts of any corporate or other business defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

13.    At all relevant times, each defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.

14.    At all relevant times, each defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that other Defendants were engaging in or planning to engage in unlawful conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

15.    At all relevant times, Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. This conspiracy, common enterprise, and common course of conduct continues to the present.

16.    The violations of law alleged in this Complaint occurred in Hillsborough County and elsewhere throughout Florida.

17.    Over the five-year period ending in 2006, Countrywide issued or underwrote more than millions, or even billions, of dollars in securities backed by sub-prime mortgages in the State of Florida, and has filed thousands of foreclosure actions throughout the State of Florida and HILLSBOROUGH County.

18.    At all times material to this action, Countrywide was acting directly and/or through its agents, "consultants," workers, employees and representatives who were acting within the scope of their employment for and/or on behalf of the business of Countrywide and under its control or right to control.

### III.    DEFENDANTS BUSINESS ACTS AND PRACTICES

19.    Countrywide originated mortgage loans and HELOCs through several channels, including a wholesale origination channel and a retail origination channel. The Countrywide employees who marketed, sold or negotiated the terms of mortgage loans and HELOCs in any of its origination channels, either directly to consumers or indirectly by working with mortgage brokers, are referred to herein as "loan officers."

20.    In Countrywide's wholesale channel, loan officers in its Wholesale Lending Division ("WLD") and Specialty Lending Group ("SLG") (now merged into the WLD) worked closely with a nationwide network of mortgage brokers to originate loans.  In its wholesale channel, Countrywide often did business as "America's Wholesale Lender," a fictitious business named owned by CHL.  In Countrywide's retail channel, loan officers employed by Countrywide in its Consumer Markets Division ("CMD") sold loans directly to consumers.   In addition, loan officers employed by Full Spectrum up until December 14, 2004, and thereafter by Countrywide's Full Spectrum Lending Division ("FSLD"), sold loans directly to consumers as part of Countrywide's retail channel.

21.    Countrywide maintained sophisticated electronic databases by means of which corporate management, including but not limited to defendants Mozilo and Sambol, could obtain information regarding Countrywide's loan production status, including the types of loan products, the number and dollar volume of loans, the underwriting analysis for individual loans, and the number of loans which were approved via underwriting exceptions. Defendants used this

information, together with data they received regarding secondary market trends, to develop and modify the loan products that Countrywide offered and the underwriting standards that Countrywide applied.

22.     The mortgage market changed in recent years from one in which lenders originated mortgages for retention in their own portfolios to one in which lenders attempted to generate as many mortgage loans as possible for resale on the secondary mortgage market. The goal for lenders such as Countrywide was not only to originate high mortgage loan volumes but also to originate loans with above-market interest rates and other terms which would attract premium prices on the secondary market.

23.     In 2004, in an effort to maximize Countrywide's profits, Defendants set out to double Countrywide's share of the national mortgage market to 30% through a deceptive scheme to mass produce loans for sale on the secondary market. Defendants viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them and to sustain homeownership. This scheme was created and maintained with the knowledge, approval and ratification of defendants Mozilo and Sambol.

24.     Defendants implemented this deceptive scheme through misleading marketing practices designed to sell risky and costly loans to homeowners, the terms and dangers of which they did not understand, including by (a) advertising that it was the nation's largest lender and could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money financing with complicated mortgage instruments like hybrid adjustable rate mortgages or payment option adjustable rate mortgages that were difficult for consumers to understand; (c) marketing these complex loan products to consumers by emphasizing the very low initial "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers to refinance only a few months after Countrywide or the loan brokers with whom it had "business partnerships" had sold them loans.

25.     Defendants also employed various lending policies to further their deceptive scheme and to sell ever-increasing numbers of loans, including (a) the dramatic easing of Countrywide's underwriting standards; (b) the increased use of low- or no-documentation loans which allowed for no verification of stated income or stated assets or both, or no request for income or asset information at all; (c) urging borrowers to encumber their homes up to 100% (or more) of the assessed value; and (d) placing borrowers in "piggyback" second mortgages in the form of higher interest rate HELOCs while obscuring their total monthly payment obligations.

26.     Also to further the deceptive scheme, Defendants created a high-pressure sales environment that propelled its branch managers and loan officers to meet high production goals and close as many loans as they could without regard to borrower ability to repay.  Defendants' high-pressure sales environment also propelled loan officers to sell the riskiest types of loans, such as payment option and hybrid adjustable rate mortgages, because loan officers could easily sell them by deceptively focusing borrowers' attention on the low initial monthly payments or interest rates.  Defendants also made arrangements with a large network of mortgage brokers to procure loans for Countrywide and, through its loan pricing structure, encouraged these brokers to place homeowners in loans with interest rates higher than those for which they qualified, as well as prepayment penalty obligations.  This system of compensation aided and abetted brokers in breaching their fiduciary duties to borrowers by inducing borrowers to accept unfavorable loan terms without full disclosure of the borrowers' options and also compensated brokers beyond the reasonable value of the brokerage services they rendered.

27.     Countrywide received numerous complains from borrowers claiming that they did not understand their loan terms.  Despite these complaints, Defendants turned a blind eye to the ongoing deceptive practices engaged in by Countrywide's loan officers and loan broker "business partners," as well as to the hardships created for borrowers by its loose underwriting practices.  Defendants cared only about selling increasing numbers of loans at any cost, in order to maximize Countrywide's profits on the secondary market.

## IV.     THE PRIMARY PURPOSE OF DEFENDANTS' DECEPTIVE BUSINESS PRACTICES WAS TO MAXIMIZE PROFITS FROM THE SALE OF LOANS TO THE SECONDARY MARKET

28.     Defendants' deceptive scheme had one primary goal -- to supply the secondary market with as many loans as possible, ideally loans that would earn the highest premiums.  Over a period of several years, Defendants constantly expanded Countrywide's share of the consumer market for mortgage loans through a wide variety of deceptive practices, undertaken with the direction, authorization, and ratification of defendants Sambol and Mozilo, in order to maximize its profits from the sale of those loans to the secondary market.

29.     While Countrywide retained ownership of some of the loans it originated, it sold the vast majority of its loans on the secondary market, either as mortgage-backed securities or as pools of whole loans.

30.     In the typical securitization transaction involving mortgage-backed securities, loans were "pooled" together and transferred to a trust controlled by the securitizer, such as Countrywide.  The trust then created and sold securities backed by the loans in the pool.  Holders

of the securities received the right to a portion of the monthly payment stream from the pooled loans, although they were not typically entitled to the entire payment stream. Rather, the holders received some portion of the monthly payments. The securitizer or the trust in controlled often retained an interest in any remaining payment streams not sold to security holders. These securitizations could involve the pooling of hundreds or thousands of loans, and the sale of many thousands of shares.

31. Countrywide generated massive revenues through these loan securitizations. Its reported securities trading volume grew from 647 billion dollars in 2000, to 2.9 trillion dollars in 2003, 3.1 trillion dollars in 2004, 3.6 trillion dollars in 2005, and 3.8 trillion dollars in 2006. (These figures relate to the ostensible values given to the securities by Countrywide or investors, and include securities backed by loans made by other lenders and purchased by Countrywide).

32. For the sale of whole (i.e., unsecuritized) loans, Countrywide pooled loans and sold them in bulk to third-party investors, often (but not exclusively) Wall Street firms. The sale of whole loans generated additional revenues for Countrywide. Countrywide often sold the whole loans at a premium, meaning that the purchaser paid Countrywide a price in excess of 100% of the total principal amount of the loans included in the loan pool.

33. The price paid by purchasers of securities or pools of whole loans varied based on the demand for the particular types of loans included in the securitization or sale of whole loans. The characteristics of the loans, such as whether the loans are prime or subprime, whether the loans have an adjustable or fixed interest rate, or whether the loans include a prepayment penalty, all influenced the price.

34. Various types of loans and loan terms earned greater prices, or "premiums," in the secondary market. For example, investors in mortgages and mortgage backed securities have been willing to pay higher premiums for loans with prepayment penalties. Because the prepayment penalty deters borrowers from refinancing early in the life of the loan, it essentially ensures that the income stream from the loan will continue while the prepayment penalty is in effect. Lenders such as Countrywide, typically sought to market loans that earned it higher premiums, including loans with prepayment penalties.

35. In order to maximize the profits earned by the sale of its loans to the secondary market, Countrywide's business model increasingly focused on finding ways to generate an ever larger volume of the types of loans most demanded by investors. For example, Countrywide developed and modified loan products by discussing with investors the prices they would be willing to pay for loans with particular characteristics (or for securities backed by loans with

particular characteristics). This enabled Countrywide to determine which loans were most likely to be sold on the secondary market for the highest premiums.

36. Further, rather than waiting to sell loans until after they were made, Countrywide would sell loans "forward" before loans were funded. In order to determine what loans it could sell forward, Countrywide would both examine loans in various stages of production and examine its projected volume of production over the next several months.

37. Loans that were sold forward were sold subject to a set of stipulations between Countrywide and the purchaser. For example, in a sale of whole loans, Countrywide might agree on October 1 that on December 1 it would deliver 2000 adjustable rate mortgage loans with an average interest rate of 6.0%, half of which would be subject to a prepayment penalty, among other characteristics. (None of these loans would have been made as of October 1.) Based on these stipulations regarding the characteristics of the loans to be included in the pool, an investor might agree to pay a price totaling 102.25% of the total face value of the loans. In other words, the purchaser agreed in advance to pay a premium of 2.25%. Then, if the loans actually delivered on December 1 had a slightly higher or lower average interest rate, the terms of the stipulation would specify how much the final price would be adjusted.

38. Countrywide originated as many loans as possible not only to maximize its profits on the secondary market, but to earn greater profits from servicing the mortgages it sold. Countrywide often retained the right to service the loans it securitized and sold as pools of whole loans. The terms of the securitizations and sales agreements for pools of whole loans authorized Countrywide to charge the purchasers a monthly fee for servicing the loans, typically a percentage of the payment stream on the loan.

39. Tantalized by the huge profits earned by selling loans to the secondary market, Defendants constantly sought to increase Countrywide's market share: the greater the number and percentage of loans it originated, the greater the revenue it could earn on the secondary market. Countrywide executives, including defendant Mozilo, publicly stated that they sought to increase Countrywide's market share to 30% of all mortgage loans made and HELOCs extended in the country.

40. In its 2006 annual report, Countrywide trumpeted the fact that "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

41. In addition, Countrywide directly and indirectly motivated its branch managers, loan officers and brokers to market the loans that would earn the highest premiums on the

secondary market without regard to borrower ability to repay. For example, the value on the secondary market of the loans generated by a Countrywide branch was an important factor in determining the branch's profitability and, in turn, branch manager compensation. Managers were highly motivated to pressure their loan officers to sell loans that would earn Countrywide the highest premium on the secondary market, which resulted in aggressive marketing of such loans to consumers.

42.     The secondary market affected Countrywide' pricing of products and, in order to sell more loans on the secondary market, Countrywide relaxed its underwriting standards and liberally granted exceptions to those standards. Countrywide managers and executives, including but not limited to defendants Mozilo and Sambol, had access to information that provided transparency and a seamless connection between secondary market transactions, the loan production process, and managerial and sales incentives.

## V.     COUNTRYWIDE ENGAGED IN DECEPTIVE PRACTICES IN THE SALE OF COMPLEX AND RISKY LOANS TO CONSUMERS

43.     Countrywide offered a variety of loan products that were both financially risky and difficult for borrowers to understand, including in particular payment option and hybrid adjustable rate mortgages and second loans in the form of home equity lines of credit.

### A.     The Pay Option ARM

44.     Particularly after 2003, Countrywide aggressively marketed its payment option adjustable rate mortgage ("Pay Option ARM") under the direction, authorization and ratification of defendants Mozilo and Sambol. The Pay Option ARM, which Countrywide classified as a "prime" product, is a complicated mortgage product which entices consumers by offering a very low "teaser" rate – often as low as 1% - for an introductory period of one or three months. At the end of the introductory period, the interest rate increases dramatically. Despite the short duration of the low initial interest rate, Countrywide's Pay Option ARMs often include a one, two, or three-year prepayment penalty.

45.     When the teaser rate on a Pay Option ARM expires, the loan immediately becomes an adjustable rate loan. Unlike most adjustable rate loans, where the rate can only change once every year or every six months, the interest rate on a Pay Option ARM can change every month (if there is a change in the index used to compute the rate).

46.     Countrywide's Pay Option ARMKs were typically tied to either the "MTA," "LIBOR" or 'COFI' index. The MTA index is the 12-month average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board. The LIBOR (London Interbank Offered Rate) index is

based on rates that contributor banks in London offer each other for inter-bank deposits. Separate LIBOR indices are kept for one month, six-month, and one-year periods, based on the duration of the deposit. For example, the one-year LIBOR index reported for June 2008 is the rate for a twelve-month deposit in U.S. dollars as of the last business day of the previous month. The COFI (11th District Cost of Funds Index) is the monthly weighted average of the interest rates paid on checking and savings accounts offered by financial institutions operating in the states of Arizona, California and Nevada.

47.     Although the interest rate increases immediately after the expiration of the short period of time during which the teaser rate is in effect, a borrower with a Pay Option ARM has the option of making monthly payments as though the interest rate had not changed. Borrowers with Pay Option ARMs typically have four different payment options during the first five years of the loan. The first option is a "minimum" payment that is based on the introductory interest rate. The minimum payment, which Countrywide marketed as the "payment rate," is the lowest of the payment options presented to the borrower. Most of Countrywide's borrowers choose to make the minimum payment.

48.     The minimum payment on a Pay Option ARM usually is less than the interest accruing on the loan. The unpaid interest is added to the principal amount of the loan, resulting in negative amortization. The minimum payment remains the same for one year and then increases by 7.5% each year for the next four years. After the fifth year, the payment will be "recast" to be fully amortizing, causing a substantial jump in the payment amount often called "payment shock."

49.     However, the loan balance on a Pay Option ARM also has a negative amortization cap, typically 115% of the original principal of the loan. If the balance hits the cap, the monthly payment is immediately raised to the fully amortizing level (i.e., all payments after the date the cap is reached must be sufficient to pay off the new balance over the remaining life of the loan). When that happens, the borrower experiences significant payment shock. A borrower with a Countrywide Pay Option ARM with a 1% teaser rate, who is making the minimum payment, is very likely to hit the negative amortization cap and suffer payment shock well before the standard 5-year recast date.

50.     Instead of making the minimum payment, the borrower has the option of making an interest-only payment for five years. The borrower then experiences payment shock when the payment recasts to cover both principal and interest for the remaining term of the loan.

51.     The ever-increasing monthly payments and payment shock characteristic of Pay Option ARMS are illustrated by the following example of a Countrywide loan. The loan had an

initial principal balance of $460,000.00, a teaser rate of 1%, and a margin of 2.9% (such that after the one-month teaser rate expired, the interest would be the 1-month LIBOR index plus 2.9%, rounded to the nearest 1/8th percent). After the teaser rate expired, based on the 1-month LIBOR rate as of the date the borrower obtained the loan, the interest rate would increase to 7.00%. Assuming the 7.00% interest rate remained in place, and the borrower chose to make the minimum payment for as long as possible, the payment schedule would be approximately as follows:

      a.   $1,479.54 per month for the first year;

      b.   $1,590.51 per month for the second year;

      c.   $1,709.80 per month for the third year;

      d.   $1,838.04 per month for the fourth year;

      e.   $1,975.89 per month for the first nine months of the fifth year; and

      f.   approximately $3,747.83 per month for the remaining twenty-five years and three months on the loan.

52.     Once the payments reach $3,747.83, this Pay Option ARM will have negatively amortized such that the balance of the loan will have increased to approximately $523,792.33. At that point, the borrower will be faced with a payment more than two-and-a-half times greater than the initial payment and likely will be unable to refinance unless his or her home has increased in value at least commensurately with the increased loan balance. In addition, increases in the LIBOR rate would cause the borrower to hit the negative amortization cap earlier, and also could result in even higher payments. If the interest rate reached 8%, just 1% higher, the negative amortization cap would be reached sooner and payments could reach $4,000.00 per month, or higher.

53.     During the underwriting process, Countrywide did not consider whether borrowers would be able to afford such payment shock. Further, depending on the state of the his or her finances, even the interim increases in the minimum payment may well be caused dramatic hardship for the borrower.

54.     Even if the borrower elects to make interest-only payments, he or she still will experience payment shock. Again assuming the interest rate stays constant at 7.00% over the life of the loan, the borrower's initial payments would be approximately $2,683.33 for five years. Thereafter, the payment will increase to approximately $3,251.18 per month, an increase of over 20%.

55.     Nearly all Countrywide's Pay Option ARM borrowers will experience payment shock such as that illustrated in paragraphs 49 through 52 above. As of December 31, 2006,

almost 88% of the Pay Option ARM portfolio held by Defendants consisted of loans that had experienced some negative amortization. This percentage increased to 91% as of December 31, 2007.

56.     Countrywide sold thousands of Pay Option ARMs, either through its branches or through brokers. For example, on a national basis, approximately 19% of the loans originated by Countrywide in 2005 were Pay Option ARMs. Countrywide made many of these loans in Florida.

57.     These loans were highly profitable. Countrywide had a gross profit margin of approximately 4% on Pay Option ARMs, compared to 2% on mortgages guaranteed by the Federal Housing Administration.

58.     Countrywide retained ownership of a number of loans for investment purposes, including thousands of Pay Option ARMs. Countrywide reported the negative amortization amounts on these Pay Option ARMs (i.e., the amount by which the balances on those loans increased) as income on its financial statements. The negative amortization "income" earned by Countrywide totaled 1.2 billion dollars by the end of 2007.

59.     Moreover, Pay Option ARMs with higher margins could be sold for a higher premium on the secondary market, because the higher margins would produce a greater interest rate and therefore a larger income stream. To insure an abundant stream of such loans, Countrywide pushed its loan officers to sell Pay Option ARMs and paid loan brokers greater compensation for selling a Pay Option ARM with a higher margin, or above-par rate, thus encouraging them to put consumers into higher cost loans. Countrywide also used a variety of deceptive marketing techniques to sell its Pay Option ARMs to consumers.

60.     Countrywide deceptively marketed the Pay Option ARM by aggressively promoting the teaser rate. Television commercials emphasized that the payment rate could be as low as 1% and print advertisements lauded the extra cash available to borrowers because of the low minimum payment on the loan. Television advertisements did not effectively distinguish between the "payment rate" and the interest rate on the loans, and nay warnings about potential negative amortization in Countrywide's print advertisements were buried in densely written small type.

61.     Borrowers, enticed by the low teaser rate, were easily distracted from the fine print in the loan documents and did not fully understand the terms of the financial implications of Countrywide's Pay Option ARMs.

62.     When a borrower obtained a Pay Option ARM from Countrywide, the only initial monthly payment amount that appeared anywhere in his or her loan documents was the minimum

payment amount. In other words, documents provided to the borrower assumed he or she would make only the minimum payment. Thus, a borrower would not know the monthly payment necessary to make a payment that would, for example, cover accruing interest, until he or she received the first statement after the expiration of the teaser rate, well after all loan documents were signed.

63.     Countrywide and the brokers it accepted as its "business partners" misrepresented or obfuscated the true terms of the Pay Option ARMs offered by Countrywide, including but not limited to misrepresenting or obfuscating the amount of time that the interest rate would be fixed for the loan, misrepresenting or obfuscating the risk of negative amortization and the fact that the payment rate was not the interest rate, and misrepresenting or obfuscating that the minimum payment would not apply for the life of the loan.

64.     Countrywide and its business partner brokers also misrepresented or obfuscated how difficult it might be for borrowers to refinance a Pay Option ARM loan. In fact, after making only the minimum payment, because of negative amortization the borrower likely would not be able to refinance a Pay Option ARM loan unless the home serving as security for the mortgage had increased in value. This is particularly true in cases for borrowers whose loans have a very high loan-to-value ratio.

65.     Countrywide and its business partner brokers often misrepresented or obfuscated the fact that a particular Pay Option ARM included a prepayment penalty and failed to explain the effect that making only the minimum payment would have on the amount of the prepayment penalty. If a borrower seeks to refinance after having made the minimum payment for an extended period, but while a prepayment penalty is still in effect, the negative amortization can cause the amount of the prepayment penalty to increase. Prepayment penalties typically equal six months worth of accrued interest. As negative amortization causes the loan principal to increase, it also causes an increase in the amount of interest that accrues that each month, thereby increasing the prepayment penalty.

66.     Countrywide and its business partner brokers also represented that the prepayment penalty could be waived if the borrower refinanced with Countrywide. However, Countrywide sells most of the loans it originates, and Countrywide has at most limited authority to waive prepayment penalties on loans it does not own, even when it controls the servicing (and is often required to pay the prepayment penalties on loans it does not own in the instances where it is not able to collect the penalty from the borrower).

**B.     _Hybrid ARM Loans_**

15

67.     In addition to the Pay Option ARMs, Countrywide offered "Hybrid" ARM loans. Hybrid ARMS have a fixed interest rate for a period of 2, 3, 5, 7, or 10 years, and then an adjustable interest rate for the remaining loan term.  The products described below were offered with the approval, direction and ratification of defendants Sambol and Mozilo.

### (i)   2/28 and 3/27 ARMs

68.     Countrywide typically offered "2/28" Hybrid ARMs through its Full Spectrum Lending Division. These 2/28 ARM loans have low, fixed interest rates for the first two years (the "2" in "2/28").  The loans often only required interest-only payments during the period the initial rate was in effect, or sometimes for the first five years of the loan.

69.     After the initial rate expires, the interest rate can adjust once every six months for the next 28 years (the "28" in "2/28").  During this period, the interest rate typically is determined by adding a margin to the one-yea LIBOR index, except that the amount the interest rate can increase at one time may be limited to 1.5%.  Because the initial rate is set independent of the index, the payment increase can be dramatic, particularly if the loan called for interest-only payments for the first two or five years.

70.     Countrywide also offered "3/27" ARMS, which operate similarly to 2/28 ARMS, except that the low initial rate is fixed for three rather than two years, and the interest rate then adjusts for 27 rather than 28 years.

71.     Countrywide underwrote 2/28 and 3/27 ARMs based on the payment required while the initial rate was in effect, without regard to whether the borrower could afford the loan thereafter.  And, like Pay Option ARMs, Countrywide's 2/28 and 3/27 ARMs typically contain prepayment penalties.

72.     A borrower with a 2/28 ARM, like a borrower with a Pay Option ARM, is subjected to steadily increasing monthly payments as well as payment shock.  For example, a Countrywide borrower obtained a 2/28 ARM for $570,000, with an initial rate of 8.95% for the first years.  Thereafter, the interest rate was to be calculated by adding a margin of 7.95% to the six-month LIBOR index.  The promissory note for this 2/28 ARM provides that the interest rate can never be lower than 8.95% and can go as high as 15.95%.  Based on the LIBOR rate that applied at the time the borrower received the loan and the terms of the note governing interest rate (and therefore payment) increases, the anticipated payment schedule was:

    a.   $4,565.86 per month for two years;

    b.   $5,141.98 per month for six months;

    c.   $5,765.48 per month for six months; and

    d.   payments of $6,403.01 per month or more thereafter.

73.     This borrower's monthly payments on this 2/28 ARM will thus increase by approximately 40% just during the 12 months between the end of the second year and beginning of the fourth year of the loan.

### (ii) 5/1, 7/1, and 10/1 ARMs

74.     Countrywide also offered 5/1, 7/1, and 10/1 "interest-only" loans. Marketed as having "fixed" or "fixed period" interest rates, these loans carried a fixed interest rate for the first 5, 7, or 10 years respectively. These loans were underwritten based on the initial fixed, interest-only payment until at least the end of 2005. However, when the fixed rate period expires, the interest rate adjusts once per year and is determined by adding a margin to an index. The monthly payments dramatically increase after the interest-only period, because payments over the remaining 25, 23, or 20 years are fully amortized to cover both principal and interest.

75.     For example, if a borrower had a 5/1 loan for $500,000 that remained constant at 7.5% for the life of the loan, the monthly payments during the five year interest-only period would be $3,125.00. The monthly payment would increase to approximately $3,694.96 for the remaining 25 years of the loan. If the interest rate increased to 8% over the remaining 25 years, the payment would jump to $3,859.08 per month.

76.     Collectively, 2/28, 3/27, 5/1, 7/1, and 10/1 ARMs will be referred to herein as "Hybrid ARMs."

### (iii) Countrywide's Deceptive Marketing of its Hybrid ARMs

77.     Countrywide marketed Hybrid ARMs by emphasizing the low monthly payment and low "fixed" initial interest rate. Countrywide and its business partner brokers misrepresented or obfuscated the true terms of these loans, including but not limited to misrepresenting or obfuscating the amount of time that the fixed rate would be in effect, misrepresenting or obfuscating the fact that the interest rates on the loans are adjustable rather than fixed, and obfuscating or misrepresenting the amount by which payments could increase once the initial fixed rate expired.

78.     Countrywide and its business partner brokers also often misrepresented or obfuscated the fact that Hybrid ARMs, particularly 2/28 and 3/27 ARMs, included prepayment penalties, or represented that the prepayment penalties could be waived when the borrowers refinanced with Countrywide. However, most loans originated by Countrywide are sold on the secondary market and, as described in paragraph 64, above, Countrywide generally cannot waive the terms of loans it does not own, even when it controls the servicing.

79.     Countrywide and its brokers also misrepresented or obfuscated how difficult it might be for borrowers to refinance Hybrid ARMs. Although borrowers often were assured that

they would be able to refinance, those seeking to refinance Hybrid ARMs after the expiration of the initial interest-only period likely would be able to do so unless the home serving as security for the mortgage had maintained or increased its value. This was particularly true for borrowers whose loans have very high loan-to-value ratios, as there would be no new equity in the borrowers' homes to help them pay fees and costs associated with the refinances (as well as many prepayment penalties that may still apply).

### C.    Home Equity Lines of Credit

80.    Countrywide also aggressively marketed HELOCs, particularly to borrowers who had previously obtained or were in the process of obtaining a first mortgage loan from Countrywide. Defendants referred to such HELOCs as "piggies" or "piggyback loans," and referred to simultaneously funded first loans and HELOCs as "combo loans." The first loan typically covered 80% of the appraised value of the home securing the mortgage, while the HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%. Thus, the HELOC and the first loan together often encumbered 100% or more of a home's appraised value.

81.    Under the terms of the piggyback HELOCs, borrowers received monthly bills for interest-only payments for the first five years of the loan term (which could be extended to ten years at Countrywide's option), during which time they could also tap any unused amount of the equity line. This was called the "draw period."

82.    Because Countrywide offered HELOCs as piggybacks to Pay Option and Hybrid ARMs, 100% or more of a property's appraised value could be encumbered with loans that required interest-only payments or allowed for negative amortization.

83.    Countrywide typically urged borrowers to draw down the full line of credit when HELOCs initially funded. This allowed Countrywide to earn as much interest as possible on the HELOCs it kept in its portfolio, and helped generate the promised payment streams for HELOCs sold on the secondary market. For the borrower, however, drawing down the full line of credit at funding meant that there effectively was no "equity line" available during the draw period, as the borrower would be making interest-only payments for five years.

84.    Upon the end of the draw period, the HELOC notes generally require borrowers to repay the principal and interest in fully amortizing payments over a fifteen year period. A fully drawn HELOC was therefore functionally a 20- or 25-year closed-end mortgage. However, Countrywide did not provide borrowers with any documents or other materials to help them calculate the principal and interest payments that would be due after the draw, or interest-only, period.

85.     Countrywide HELOCs were underwritten not to the fully amortized payment, but to the interest-only payments due during the draw period. Countrywide typically charged an early termination fee for HELOCs closed before three years, and sometimes would charge a monthly fee for HELOCs where the balance fell below a specified amount.

86.     A borrower with an interest-only or a negatively amortizing loan faces even greater payment shock if he or she also has a fully drawn HELOC. For example, a borrower with a fully drawn $100,000 HELOC at a 7.00% interest rate will have monthly interest-only payments of approximately $583.33. At the end of the draw period, the payment will increase to $898.83. This payment increase is in addition to whatever payment increase the borrower is experiencing on his or her first mortgage. This potential dual payment shock is typically obfuscated from or not explained to borrowers. Moreover, a borrower with a piggyback HELOC, particularly a borrower whose first mortgage negatively amortized or allowed interest-only payments, is even less likely to be able to refinance at the time of his or her payment shock unless his or her home has increased in value.

## VI.     COUNTRYWIDE EASED AND DISREGARDED UNDERWRITING STANDARDS IN ORDER TO INCREASE ITS MARKET SHARE.

87.     Driven by its push for market share, Countrywide did whatever it took to sell more loans, faster – including by easing its underwriting criteria and disregarding the minimal underwriting criteria it claimed to require. By easing and disregarding its underwriting criteria, Countrywide increased the risk that borrowers would lose their homes. Defendants Mozilo and Sambol actively pushed for easing Countrywide's underwriting standards and documentation requirements, allowed the liberal granting of exceptions to those already eased standards and requirements, and received reports detailing the actual underwriting characteristics and performance of the loans Countrywide funded.

### A.     Countrywide' Low- and No-Documentation Loans

88.     Traditionally, lenders require borrowers seeking mortgage loans to document their income, for example by providing W-2s or tax returns, as well as assets. Countrywide, however, disregarded such documentation requirements with respect to its riskiest loan products and introduced a variety of reduced or no documentation loan programs that eased and quickened the loan origination process. The vast majority of the Hybrid ARMs and nearly all of the Pay Option ARMs originated by Countrywide were reduced or no documentation loans.

89.     As an example of one of its widespread no documentation programs, Countrywide made Pay Option ARMs, Hybrid ARMs, and piggyback HELOCs, among other loans, pursuant to its "Stated Income Stated Assets," or "SISA," program. The borrower's

income and assets were stated but not verified. Employment was verbally confirmed and income was supposed to be roughly consistent with incomes earned in the type of job in which the borrower was employed. Reduced documentation loans, in turn, allowed borrowers to document their income through the provision of W-2 tax forms, bank statements, or verbal verification of employment.

90.     These low- and no-documentation programs, such as SISA, enabled Countrywide to process loans more quickly and therefore to make more loans. Stated income loans also encouraged the overstating of income – loan brokers and officers either overstated the borrower's income without his or her knowledge, or led the borrower into overstating his or her income without explaining the risk of default that the borrower would face with a loan he or she could not actually afford. According to a former Countrywide loan officer, for example, a loan officer might say, "with your credit score of X, for this house, and to make X payment, X is the income you need to make." Many borrowers responded by agreeing that they made X amount in come.

91.     For stated income loans, it became standard practice for loan processors and underwriters to check www.salary.com to see if a stated income was within a reasonable range, with more tolerance on the upside for Florida salaries. Because loan officers knew about this practice, they too would look at salary.com to figure out the parameters ahead of time and know by how much they could overstate (or fabricate) income.

**_B.      Countrywide's Easing of Underwriting Standards_**

92.     Countrywide also relaxed, and often disregarded, the traditional underwriting standards used to separate acceptable from unacceptable risk in order to produce more loans for the secondary market. Initially, for example, a borrower had to have a certain defined credit score for a stated income loan. As the secondary market's appetite for loans increased, Countrywide relaxed its guidelines so that a borrower with a credit score that did not meet Countrywide's previously certain defined creditcould get a stated income loan with 100% financing.

93.     Underwriting standards which Countrywide relaxed included qualifying interest rates (the rate used to determine whether borrowers can afford loans), loan-to-value ratios (the amount of the loan(s) compared to lower of the appraised value or sale price of the property), and debt-to-income ratios (the amount of borrowers' monthly income compared to their monthly indebtedness).

94.     With respect to qualifying rates, while Countrywide offered loans with initial low payments that would increase, loans were underwritten without regard to borrowers' long-term financial circumstances. Until at least the end of 2005, Countrywide underwrote and approved its

Hybrid ARMs based on the fixed interest rate applicable during the initial period of the loan, without taking into account whether the borrowers would be able to afford the dramatically higher payments that would inevitably be required during the remaining term of the loan.

95.     In addition, Countrywide's approach to underwriting and marketing Pay Option ARMs diverged.  Countrywide underwrote Pay Option ARMs based on the assumption that borrowers would not make the minimum payment and therefore not experience negative amortization.  In contrast, Countrywide marketed Pay Option ARMs by emphasizing the minimal payments.  Countrywide continued this underwriting practice even though it knew that many of its Pay Option ARM borrowers would choose to make only the minimum monthly payment and that a high percentage of such borrowers had experienced negative amortization on their homes, as described in paragraph 53, above.

96.     Countrywide also underwrote and approved HELOCs based on the borrower's ability to afford the interest-only payments during the initial period of the loan, not based on the borrower's ability to afford the subsequent, fully amortized principal and interest payments.

97.     Countrywide eased other basic underwriting standards.  Starting in 2003, as Defendants pushed to expand market share, underwriting standards and verification requirements became more flexible to enable underwriters to approve loans faster.  Countrywide, for example, allowed higher and higher loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios – the higher the ratio, the greater the risk that a borrower will default and will be unable to refinance in order to avoid default.  Similarly, Countrywide approved loans with higher and higher debt-to-income ("DTI") ratios – the higher ratio, the greater the risk the borrower will have cash-flow problems and miss mortgage payments.

### C.     Countrywide's Exception" Underwriting Compromised Standards

98.     Countrywide approved loans that it knew to be high risk, and therefore highly likely to end up in default, by ignoring its own minimal underwriting guidelines.  Based on the proposed loan terms and the borrower's financial and credit information, Countrywide's computerized underwriting system ("CLUES") issued a loan analysis report that rated the consumer's credit and ability to repay the loan, and also indicated whether a proposed loan was in compliance with Countrywide's underwriting guidelines.  Based on this analysis, the CLUES report would recommend that the loan be approved, the loan be declined, or that the loan be "referred" to manual underwriting. CLUES, for example, might flag a "rule violation" if the borrower's LTV, CLTV or credit score fell outside the guidelines for a given loan product.  In such instances, CLUES would make a recommendation to "refer" the loan for further analysis by a Countrywide underwriter.

99.    The CLUES result was only a recommendation, not a final decision. The role of the underwriter was basically to verify information and ultimately decide whether to approve a loan based on Countrywide's underwriting criteria. Underwriters could overcome potential rule violations or other underwriting issues flagged by CLUES by adding on "compensating factors," such as letters from the borrower that addressed a low FICO score or provided explanations regarding a bankruptcy, judgment lien, or other issues affecting credit status.

100.    Underwriters were under intense pressure to process and fund as many loans as possible. They were expected to process 60 to 70 loans per day, making careful consideration of borrowers' financial circumstances and the suitability of the loan product for them nearly impossible.

101.    As the pressure to produce loans increased, underwriters, their superiors, branch managers, and regional vice presidents were given the authority to grant exceptions to Countrywide's minimal underwriting standards and to change the terms of a loan suggested by CLUES. Even if CLUES had recommended denying a loan, the underwriter could override that denial if he or she obtained approval from his or her supervisor.

102.    Because of the intense pressure to produce loans, underwriters increasingly had to justify why they were not approving a loan or granting an exception for unmet underwriting criteria to their supervisors, as well as to dissatisfied loan officers and branch managers who earned commissions based on loan volume. Any number of Countrywide managerial employees could override an underwriter's decision to decline a loan and request an exception to an underwriting standard. Countrywide employees also could submit a request for an exception to Countrywide's Structured Loan Desk in Plano, Texas, a department specifically set up by Countrywide, at the direction of defendants Mozilo and Sambol, to grant underwriting exceptions. According to a former employee, in 2006, 15,000 to 20,000 loans a month were processed through the Structured Loan Desk.

103.    Countrywide granted exceptions liberally, further diluting its already minimal underwriting standards for making loans. Countrywide granted exception requests in a variety of circumstances where one or more basic underwriting criteria of the borrower did not meet loan product guidelines, including, for example, LTV or CLTV, loan amount and credit score. Countrywide placed borrowers in risky loans such as Hybrid and Pay Option ARMs, based on stated but not verified income and assets, and then overlooked its few remaining underwriting indicia of risk.

104.    To attract more business Countrywide promoted its relaxed underwriting standards and ready grant of exceptions to brokers. For example, Countrywide promoted

"Unsurpassed Product Choices and Flexible Guidelines," including (a) "100% financing for purchase or refinancing" loans; (b) "80/20 combo loans for stated Self-Employed and Non Self-Employed;" (c) "Stated Self-Employed and Non Self-Employed loan programs with as low as a 500 credit score." Countrywide stated that its "Specialty Lending Group's experienced and knowledgeable loan experts are empowered to review all loan packages, make sound credit decisions and provide equality lending solutions – yes, even for "hard to close" loans."

> **D.     _Countrywide's Risk-Layering and Pressure to Sell "Piggyback" Loans Further Loosened Underwriting Practices_**

105.     Countrywide compromised its underwriting standards even further by risk layering, i.e., combining high risk loans with one or more relaxed underwriting standards. Countrywide was well aware that layered risk created a greater likelihood that borrowers would lose their homes.

106.     As early as January 2005, Countrywide identified the borrower/loan characteristics as having a negative impact on the underwriting evaluation process.

107.     Nonetheless, Countrywide combined these very risk factors in the loans it promoted to borrowers. Countrywide introduced, for example, loan programs that allowed for higher LTVs/CLTVs, less documentation and lower credit scores. A high risk loan such as a Pay Option ARM could be sold to borrowers with increasingly lower credit scores. In addition, by accepting higher DTI ratios and combining Pay Option ARMs with second mortgages that allowed borrowers to finance a down payment, Countrywide would qualify borrowers with fewer financial resources, and hence a higher likelihood of default.

108.     With a second or "piggyback" mortgage, the borrower could get a first loan for 80% of the purchase price (i.e., an 80% LTV) and a second loan for 20% of the purchase price (a 20% LTV), for a combined loan-to-value ratio of 100%. This allowed the borrower to finance a down payment and also avoid paying mortgage insurance (which typically is required if the LTV on a first loan exceeds 80%). Such loans obviously were risky as the borrower had contributed no funds whatsoever to the loan and, if the loan required no documentation, he only stated his or her income and assets.

## VII.   COUNTRYWIDE ENGAGED IN DECEPTIVE MARKETING PRACTICES TO SELL INCREASING NUMBERS OF LOANS

109.     Driven by its push for market share, Countrywide did whatever it took to sell more loans, faster – including by engaging in a number of deceptive marketing practices under the direction and with the ratification of defendants Mozilo and Sambol.

> **A.     _Countrywide Deceptively Lulled Borrowers Into Believe That it Was a "Trusted_**

*Advisor" Looking Out for the Borrowers' Best Interests*

110.     Countrywide sought to induce borrowers into believing that it was looking out for their best interest through various types of solicitations. Countrywide published television, radio, and print advertisements, for example, touting itself as "the company you can trust" and urging consumers to "join the millions of homeowners who have trusted Countrywide." Countrywide capitalized on its status as the "number one mortgage lender" and claimed that it "had years to perfect [its] craft" and offered "industry leading expertise" and that "[w]ith over 35 years of service and one of the widest selections of loan programs, [it] is an expert at finding solutions for all kinds of situations." As another example, Countrywide offered "consultation[s] with our home loan experts" and claimed it "would go the distance with you to help secure a loan program to fit your financial needs and goals."

111.     Countrywide also engaged in extensive solicitation campaigns aimed at those borrowers it was easiest for it to find – existing Countrywide customers. Countrywide targeted existing customers with tailored letters and e-mail solicitations, creating the impression that it was a mortgage expert that advised its borrowers, at no cost, regarding the financial mortgage options that were in their best interest. For example, Countrywide took advantage of Pay Option ARM customers' worries regarding potential future "Steep payment adjustments," by sending them a "special invitation" to talk with "specially-trained consultants" regarding "your current financial situation, at no charge, to see if refinancing may help put you in a better financial position."

112.     Countrywide also created an annual "anniversary" campaign, by sending letters and e-mails to existing customers offering a "free Anniversary Loan Review," which it touted as a "home loan analysis" with an "experienced Loan Consultant." Countrywide advertised itself in these solicitations as, for example, an "expert at finding solutions" and "smart financial options" that would best suit borrowers' financial needs.

113.     Countrywide operated an extensive telemarketing operation, aimed both at new potential customers and existing Countrywide customers, in which it touted its expertise and claimed to find the best financial options for its customers. For example, Countrywide instructed its Full Spectrum loan officers to memorize a script that instructed them to "build rapport" and "gain trust" in conversations with potential customers, and to do so with existing customers by "positioning" telephone calls, the true purpose of which was to sell refinance loans, as "Customer Service loan check-up[s]." On these calls, Countrywide instructed FSLD loan officers to state, for example, "I'm an experienced mortgage lending professional specializing in helping people improve their financial situation." Countrywide even instructed FSLD loan officers to state, for example, "I'm an experienced mortgage lending professional specializing in helping people

improve their financial situation." Countrywide even instructed loan officers to offer to provide advice on other lender's mortgage loans and to tell potential customers, that "even if you're working with someone else and just want a second opinion – mortgages can be very complicated. I'm here for that."

114.    In addition, when handling initial calls from prospective customers, for example, Countrywide instructed its FSLD loan officers contrary to the kinds of representations described in this paragraph and paragraphs 108 through 111, above, Countrywide often did not sell borrowers loans that were in their best interest.

### B.    *Countrywide Encouraged Serial Refinancing*

115.    In order to consistently produce more loans for sale to the secondary market, Countrywide aggressively marketed refinance loans to those homeowners it had no trouble finding – Countrywide customers. Countrywide misled these borrowers regarding the benefits of refinancing, including by using the deceptive marketing practices described in paragraphs 118 through 127 below. In addition, Countrywide created a perpetual market for its refinance loans by selling Pay Option and Hybrid ARMs that borrowers would have to refinance in order to avoid payment shock. Countrywide knew that borrowers who could not afford the inevitable payment increase on such loans and who were unable to refinance would be at great risk of losing their homes.

116.    Countrywide provided lists of existing customers to its loan officers responsible for out bound marketing. Defendants' loan officers hounded Countrywide customers by phone, mail, and electronic mail with refinance loan officers. For example, FSLD "leads" – telephone numbers for existing, eligible customers – were uploaded into a telemarketing database on a weekly basis.

117.    Countrywide even solicited customers who were having trouble making payments or facing foreclosure, without regard to the risk that the customer would default on Pay Option and Hybrid ARM refinance loans. FSLD solicited existing prime customers who had "recurring" missed payments. Countrywide required its customer service representatives to market refinance loans to borrowers who called with questions, including borrowers who were behind on their monthly payments or facing foreclosure.

118.    Countrywide also solicited existing customers on other occasions, including on their annual loan "anniversaries" (see paragraph 111, above) and shortly before a rate or payment was to reset on Pay Option or Hybrid ARMS, without regard to whether the loan had a prepayment penalty prior that had not yet expired. In doing so, the Countrywide Defendants

refinanced borrowers while the prepayment penalty on their prior Countrywide loan was still in effect, often concealing the existence of the prepayment penalty.

119.    Countrywide claims that approximately 60% of FSLD's business has been comprised of refinancing Countrywide loans.

**C.    Countrywide Misled Borrowers About the True Terms of Pay Option and Hybrid ARM Loans by Focusing the Borrowers' Attention on Low Beginning Payments and Teaser Rates**

120.    Because Pay Option ARM and Hybrid ARMs start with lower monthly payments and interest rates than most other types of loan products, and given their complex nature, Countrywide was able to easily sell such loans to borrowers by focusing on the initial low monthly payments and/or rates and by obscuring or misrepresenting the true risks of such loans.

121.    With respect to Pay Option ARMs, the crux of Countrywide's sales approach was to "sell the payment." When presenting a borrower with various loan options, for example, Countrywide would "sell the payment" by showing the borrower the minimum monthly payments for the Pay Option ARM in comparison to other loan products with larger payments. Then, Countrywide would ask which payment the borrower preferred without discussing other differences between the loan products. Naturally, in this situation, most borrowers chose the option with the lowest payment, the Pay Option ARM, without realizing that the payment would last for only a short time before it would begin to increase.

122.    If, instead, Countrywide presented the Pay Option ARM as the only option, it would "sell the payment" by emphasizing the low minimum payment and how much the borrower would "save" every month by making such a low payment, without discussing the payment shock and negative amortization that inevitably result when borrowers make minimum payments. Given the complexity of Pay Option ARMs, such a presentation easily misled borrowers regarding the long-term affordability of their loans.

123.    Countrywide also represented that the initial monthly payment would last for the entire term of the loan, or for some period longer than that provided for by the loan's terms.

124.    Countrywide engaged in similar deceptive representations with respect to Hybrid ARMs. For example, Countrywide focused its sales presentation on the interest-only payments during the initial fixed-rate period, i.e. the 2-year period on a 2/28 ARM or the 3-year period on a 3/27 ARM, not on how the payment would adjust to include both principal and interest after the initial fixed-rate period. It also represented that the payments would last for the entire term of the loan, or for some period longer than that provided for by the loan's terms.

125.    When selling Pay Option and Hybrid ARMs, Countrywide engaged in another deceptive practice – rather than selling the payment, it would sell the rate. Countrywide either

focused exclusively on the initial one-month, two-year, or three-year "fixed" interest rate, for example, without discussing that the rate would reset after the initial period to a potentially much higher rate, or it represented that the initial interest rate would last for a much longer period than it actually did or for the entire term of the loan.

126.     Countrywide's letter and e-mail solicitations, as well as telemarketing calls, also focused borrowers' attention on short-term low monthly payments.  FSLD loan officers, for example, were required to memorize scripts that marketed low monthly payments by focusing (a) on the potential customer's dissatisfaction with his or her current monthly payments under his or her current mortgage loan and/or (b) on so-called "savings" that result from minimum monthly payments.  As just one of many potential examples, to overcome a borrower's claim that he or she already has a loan with a low interest rate, Countrywide required FSLD loan officers to memorize the following response . . . . Which would you rather have, a long-term fixed payment, or a short-term one that may allow you to realize several hundred dollars a month in savings?  I am able to help many of my clients lower their monthly payments and it only takes a few minutes over the phone to get started."  What the FSLD loan officer did not state was that the borrowers would, in fact, not save money because the payment on the new loan would ultimately exceed the payment on the borrower's current loan.

127.     Borrowers subject to any of the deceptive marketing practices described above would not understand the true risks and likely unaffordability of their Pay Option or Hybrid ARMs.  Many borrowers did not read their loan documents and disclosures before signing. Countrywide often made borrowers sign a large stack of documents without providing the borrower with time to read them.  Other borrowers were unable to read English.  And, given the complexity of Pay Option and Hybrid ARMs, many borrowers who managed to read their loan documents did not understand the terms of the loans they were being sold.

128.     As a result, many borrowers who obtained Pay Option and Hybrid ARMs did not understand that their initial monthly payment would at some point "explode," that their initial interest rate would increase and become adjustable, or that the principal amount of their loans could actually increase.  Countrywide received numerous complaints regarding these practices from consumers.  Many borrowers complained that they did not understand the terms of their Pay Option and Hybrid ARMs, including the potential magnitude of changes to their monthly payments, interest rates, or loan balances.  Many borrowers also complained that Countrywide's loan officers either did not tell them about the payment or rate increases on such loans or promised that they would have fixed-rate, fixed payment loans, rather than adjustable rate mortgage loans with increasing payments.

129.    Despite these complaints, Defendants did not alter their deceptive marketing practices and did not address the Hardship created by their practice of making Pay Option and Hybrid ARMs with little or no regard to affordability. Defendants cared only about doing whatever it took to sell increasing numbers of loans.

### D.    *Countrywide Misled Borrowers About their Ability to Refinance Before The Rates or Payments on Their Pay Option and Hybrid ARMs Increased*

130.    If a borrower was able to figure out that he or she had obtained a Pay Option or Hybrid ARM *before* signing the loan documents, he or she may still have been misled by Countrywide in another way – Countrywide's loan officers often overcame borrower concerns about exploding monthly payments or increasing interest rates by promising that they would be able to refinance with Countrywide into a loan with more affordable terms before the payments or rate reset.

131.    Countrywide often represented that the value of a borrower's home would increase, thus creating enough equity to obtain a loan with better terms. However, borrowers with interest-only or negatively amortizing loans that encumbered as much as, if not more than, 100% of their home's appraised value, were highly unlikely to be able to refinance into another loan if their home did not increase in value. Additionally, any customers who sought to refinance a Countrywide mortgage would likely incur a substantial prepayment penalty, thus limiting their ability to obtain a more favorable loan.

132.    Countrywide loan officers often misrepresented or obfuscated the fact that a borrower's loan had a prepayment penalty or misrepresented that a prepayment penalty could be waived. Countrywide also promised borrowers that they would have no problem refinancing their Pay Option or Hybrid ARMs, when in fact they might have difficulty refinancing due to the existence of prepayment penalties. Prepayment penalties on Pay Option and Hybrid ARMs essentially prevent many borrowers from refinancing such unaffordable loans before their payments explode or rates reset.

133.    Countrywide received numerous complaints from borrowers who claimed that they had not been told about the prepayment penalty or that the loan officer promised they would not have one. Again, despite receiving such complaints, Defendants turned a blind eye to deceptive marketing practices regarding prepayment penalties and the resulting adverse financial consequences to borrowers.

### E.    *Countrywide Misled Borrowers About the Cost of Reduced and No Document Loans*

134.     Countrywide touted its low documentation requirements, urging borrowers to get "fastrack" loans so that they could get cash more quickly.  However, many borrowers who obtained these loans possessed sufficient documentation to qualify for full document mortgages, and some submitted that documentation to their loan officer or to one of Countrywide's business partner brokers.  In emphasizing the ease, speed and availability of reduced or no document loans, Countrywide and its brokers concealed the fact that borrowers could qualify for a lower rate or reduced fees if they elected to apply for a mortgage by fully documenting their income and assets.

### F.     Countrywide Misled Borrowers Regarding the Terms of HELOCs

135.     Countrywide misrepresented the terms of HELOCs, including without limitation by failing to inform the borrower that he or she would not have access to additional credit because he or she was receiving a full drawer or that that monthly payment on the HELOC was interest-only and the borrower therefore would not be able to draw additional funds on the HELOC at a later date.

136.     Countrywide also misrepresented or obfuscated the payment shock that borrowers would experience after the interest-only payment period on the HELOCs ended. Countrywide's Call Center received large numbers of calls from borrowers complaining that they did not understand that the payments on their full-draw HELOCs would only cover interest, or that the interest rates on their HELOCs would adjust and increase.

## VIII.   IN ORDER TO INCREASE MARKET SHARE, DEFENDANTS CREATED A HIGH-PRESSURE SALES ENVIRONMENT WHERE EMPLOYEES WERE REWARDED FOR SELLING AS MANY LOANS AS THEY COULD, WITHOUT REGARD TO BORROWERS' ABILITY TO REPAY

137.     Despite touting itself as a lender that cared about its borrowers, Countrywide was, in essence, a mass production loan factory set up to produce an ever-increasing stream of loans without regarding to borrowers' ability to repay their loans and sustain homeownership.  In order to provide an endless supply of loans for sale to the secondary market, Defendants pressured Countrywide employees involved in the sale and processing of loans to produce as many loans as possible, as quickly as possible, and at the highest prices.

138.     Defendants created this pressure through a compensation system, which predictably led employees to disregard Countrywide's minimal underwriting guidelines and to originate loans without regard to their sustainability.  Countrywide's compensation system also motivated its loan officers to engage in the deceptive marketing practices described in the preceding sections.

139.    Defendants incentivized managers to place intense pressure on the employees they supervised to sell as many loans as possible, as quickly as possible, at the highest prices possible. Branch managers received commissions or bonuses based on the net profits and loan volume generated by their branches. In most circumstances, however, branch managers were eligible for such commissions or bonuses only if certain quota were reached in regards to volume. Branch managers were also rewarded for meeting production goals set by corporation management, or penalized for failing to do so.

140.    Countrywide provided branch managers with access to computer applications and databases that allowed them to monitor loan sales on a daily basis and pressure employees to "sell, sell, sell." A branch manager could input the type of loan (such as a Pay Option ARM), and determine what price a borrower would pay for that loan, as well as the amount of profit the loan would likely generate for the branch. Branch managers could also monitor their branches' loans sales performance by tracking loans that were in the process of being underwritten and the prices and characteristics of loans sold by the branch and by particular loan officers, during any specified time period.

141.    With such tools available, Countrywide's branch managers were able to constantly pressure loan officers, loan processors, and underwriters to do their part in increasing loan production – by hunting down more borrowers, selling more loans, and processing loans as quickly as possible, thereby boosting loan production, branch profits, and branch manager commissions and bonuses. This high-pressure sales environment invited deceptive sales practices and created incentives for retail branch managers, other managers, loan officers, loan specialists, and underwriters to jam loans through underwriting without regard to borrower ability to repay.

142.    Countrywide created additional pressure to engage in deceptive marketing practices and sell loans without regard to their sustainability by paying its loan officers and managers a modest base salary that could be supplemented by commissions or bonuses. In most circumstances, the employees were eligible to receive these commissions or bonuses only if they, or the employees the supervised, sold a minimum number of dollar volume of loans.

143.    Not only did this compensation system create incentives for employees to sell as many loans as possible, as quickly as possible, it also created incentives for retail employees to steer borrowers into riskier loans. For example, Countrywide paid greater commissions and bonuses to CMS managers and loan officers for selling riskier loans. Countrywide also paid greater commissions and bonuses to FSLD managers and loan officers for such riskier loans.

144.    Countrywide's compensation system also created incentives for wholesale loan officers to steer brokers and their clients into riskier loans. Countrywide's wholesale loan

30

officers worked one-on-one with "business partner" brokers approved by Countrywide. The loan officers cultivated relationships with brokers in order to persuade them to bring their business to Countrywide and, in particular, to work with a particular loan officer so that he or she, and his or her managers, could earn greater commissions.

145.    Countrywide's high-pressure sales environment and compensation system encouraged serial refinancing of Countrywide loans. The retail compensation systems created incentives for loan officers to churn the loans of borrowers to whom they had previously sold loans, without regard to a borrower's ability to repay, and with the consequence of draining equity from borrowers' homes. Although Countrywide maintained a policy that discouraged loan officers from refinancing Countrywide loans within a short time period after the original loan funded (Countrywide often changed this time period, which was a very low amount of months for some loan products), loan officers boosted their loan sales by targeting the easiest group of potential borrowers to locate – Countrywide borrowers – as soon as that period expired.

146.    Countrywide management at all levels pressured the employees below them to sell and approve more loans, at the highest process, as quickly as possible, in order to maximize Countrywide's profits on the secondary market. Defendant Sambol, for example, monitored Countrywide's loan production numbers and pressured employees involved in selling loans or supervising them to produce an ever-increasing numbers of loans, faster. Regional vice presidents pressured branch managers to increase their branches' loan numbers. Branch managers pressured loan officers to produce more loans, faster, and often set their own branch-level production quotas.

147.    Underwriters were also pressured to approve greater numbers of loans quickly and to overlook underwriting guidelines while doing so. Defendant Sambol pressured underwriters to increase their loan production and to increase approval rates by relaxing underwriting criteria. Regional operations vice presidents, branch operations managers, branch mangers, and loan officers all pressured underwriters to rush loan approvals. Countrywide required underwriters to meet loan processing quotas and paid bonuses to underwriters who exceeded them.

148.    Customer service representatives at Countrywide's Call Center also were expected to achieve quotas and received bonuses for exceeding them. Countrywide required service representatives to complete calls in three minutes or less, and to complete as many as sixty-five to eighty-five calls per day. Although three minutes is not sufficient time to assist the confused or distressed borrowers who contacted them, Countrywide required service representatives to market refinance loans or piggyback HELOCs to borrowers who called with

questions – including borrowers who were behind on their monthly payments or facing foreclosure. Using a script, the service representatives were required to pitch the loan and transfer the caller to the appropriate Countrywide division. Service representatives also received bonuses for loans that were so referred and funded.

149.    Countrywide employees from senior management down to branch managers pressured the employees below them to sell certain kinds of products. Regional vice presidents, area managers, and branch managers pushed loan officers to sell Pay Option ARMs, piggyback HELOCs, and loans with prepayment penalties, primarily because such loans boosted branch profits, manager commissions, and Countrywide's profits on the secondary market.

150.    If any of these employees including branch managers, loan officers, loan processors, underwriters, and customer service representatives, failed to produce the numbers expected, Countrywide terminated their employment.

## IX.    AS PART OF ITS DECEPTIVE SCHEME, COUNTRYWIDE COMPENSATED ITS BUSINESS PARTNER BROKERS AT A HIGHER RATE FOR MORE PROFITABLE LOANS, WITHOUT CONSIDERATION OF SERVICES ACTUALLY PROVIDED BY THE BROKERS

151.    In Florida, a mortgage broker owes his or her client a fiduciary duty. A mortgage broker is customarily retained by a borrower to act as the borrower's agent in negotiating an acceptable loan. All persons engaged in this business in Florida are required to obtain real estate licenses and to comply with statutory requirements. Among other things, the mortgage broker has an obligation to make a full and accurate disclosure of the terms of a loan to borrowers, particularly those that might affect the borrower's decision, and to act always in the utmost good faith toward the borrower and to refrain from obtaining any advantage over the borrower.

152.    Countrywide paid brokers compensation in the form of yield spread premiums or rebates to induce brokers to place borrowers in loans that would earn Countrywide the greatest profit on the secondary market, regardless of whether the loans were in the best interest of, or appropriate for, the borrowers. In fact, the mortgages that earned Countrywide the highest profit, and therefore would pay the highest rebates or yield spread premiums to brokers, often were not in the best interest of the borrower.

153.    For example, Countrywide paid a yield spread premium of brokers if a loan was made at a higher interest rate than the rate for which the borrower qualified and without regard for the services actually provided by the broker. Countrywide paid a rebate to a broker if he or she originated or negotiated a loan that included a prepayment penalty. A three-year prepayment penalty resulted in a higher rebate to the broker than a one-year prepayment penalty.

Countrywide would pay this higher rebate even in instances where the loan did not include a provision, such as a more favorable origination fee or interest rate, to counterbalance the prepayment penalty, and where brokers did not perform any additional services in connection with the loan.

154.    Countrywide also would pay rebates in exchange for a broker providing an adjustable rate loan with a high margin (the amount added to the index to determine the interest rate).  Countrywide would provide an additional rebate to brokers if they were able to induce a borrower to obtain a line of credit.

155.    Countrywide accepted loans form brokers in which the broker earned a high amount of points, whether in origination fees, rebates, or yield spread premiums.  This high level of compensation was well in excess of the industry norm and encouraged brokers to sell Countrywide loans without regard to whether the loans were in their clients' best interest.  In addition, the compensation paid by Countrywide to brokers was well in excess of, and not reasonably related to, the value of the brokerage services performed by Countrywide's business partner brokers.

156.    In order to maximize their compensation from Countrywide, brokers misled borrowers about the true terms of Pay Option and Hybrid ARMs, misled borrowers about their ability to refinance before the rates or payments on their loans increased, misled borrowers about the cost of reduced and no document loans, and misled borrowers regarding the terms of HELCOs by engaging in the same kinds of deceptive practices alleged at paragraphs 60 through 66, 77 through 79, 110 through 136 above.

157.    Borrowers often did not realize that their loans contained terms that were unfavorable to them and provided greater compensation to their brokers specifically as payment for those unfavorable terms.  An origination fee or other charges imposed by a broker are either paid by the borrower or financed as part of the loan.  In contract, rebates and yield spread premiums are not part of the principal of the loan and instead are paid separately Countrywide to the broker. Documentation provided to the borrower might indicate, at most, that a yield spread premium or rebate was paid outside of closing (often delineated as "p.o.c." or "ysp poc"), with no indication that the payment constituted compensation from Countrywide to the broker for placing the borrower in a loan with terms that were not in the borrower's best interest, such as a higher interest rate or lengthier prepayment penalty.

158.    Countrywide closely monitored and controlled the brokers with whom it worked. Countrywide required brokers it accepted as "business partners" to cooperate and provide all information, documents and reports it requested so that Countrywide could conduct a review of

the broker and its operations. In addition, Countrywide required the broker to warrant and represent that all loans were closed using documents either prepared or expressly approved by Countrywide.

## X.      COUNTRYWIDE'S DECEPTIVE AND MISLEADING FORM 10-K FILINGS

159.    CFC made certain representations about its lending practices in its Form 10-K filings for the years 2002 – 2007 with the United States Securities and Exchange Commission (SEC) as hereinafter set forth. A Form 10-K is an annual corporate report required by the SEC. It is a comprehensive summary of the company's performance and includes such information as company history, audited financial statements and information relating to subsidiaries. Through these 10K's, CFC made specific representations relating to the quality and value of its loans to the consuming public, investors and to government sponsored entities such as Fannie Mae and Freddie Mac. They did so by representing in detail the strict underwriting criteria CFC employed for its Prime and Subprime Loans.

160.    In its 2002 Form 10-K, Defendant CFC generally explained the underwriting criteria for Prime Loans and Subprime Loans as follows: (a) Employment and income – applicant must exhibit the ability to generate income on regular and ongoing basis in sufficient amount to pay mortgage payment and other debts existing at time of underwriting; and (b) Subprime Loans, applicants generally do not satisfy Freddie Mac & Fannie Mae guidelines regarding credit history, debt/income ratio and/or cash reserves. Exceptions generally made when compensating factors exist, such as low loan to value ratio, low debt to income ratio, substantial disposable income or stable employment.

161.    In its 2003 Form 10-K, Defendant CFC generally represented that its Credit Policy required consideration of the applicant's capacity to pay and consideration of property value. Moreover, Defendant CFC represented that its underwriting guidelines comply with Freddie Mac and Fannie Mae guidelines for Prime Loans but that guidelines for Subprime Loans were determined by salability in the secondary mortgage market. Defendant CFC also represented that its Loan Origination Standards were designed to produce high quality loans. Furthermore, Defendant CFC stated that nearly all of its loans are sold into secondary market via securities with limited recourse, i.e. Mortgage Backed Securities (MBS).

162.    In its 2004 Form 10-K, Defendant CFC represented that a decline in Prime mortgage revenues was offset by increased production from high margin Subprime Loans. Thus, in 2004, 49% of loans were Subprime Adjustable Rate Mortgages (ARM) versus 18% in 2003 as a result of the increase in fixed mortgage rates and the volume of Subprime and equity loans increased 104% from 2003. Nonetheless, CFC continued to represent that its Credit Policy

required consideration of an applicant's capacity to pay and consideration of property value. Similarly, CFC continued to state that its underwriting guidelines complied with Freddie Mac and Fannie Mae guidelines for Prime Loans while Subprime guidelines were designed so these loans are salable in the secondary market, into which market nearly all of Defendants' loans were sold through Mortgage Backed Securities. Finally, CFC continued to maintain that its Loan origination standards produced high quality loans.

163.    In its 2005 Form 10-K, Defendant CFC repeated its statements relating to consideration of a consumers' capacity to pay a loan and about underwriting guidelines for Prime Loans (Freddie Mac and Fannie Mae standards) versus Subprime Loans (salability in secondary market). However, CFC hedged its previous statements regarding due diligence by shifting its responsibility for income and asset verification to consumers with the following caveat: "We depend on the accuracy and completeness of information about customers." "We rely on information furnished to us by or on behalf of customers... and on representations of customers as to accuracy." Defendant CFC also stated:    "We attribute the overall increase in delinquencies... primarily to the relative increase in the number of loans in the nonprime portfolio.... We believe the delinquency rates... are consistent with industry experience...."

164.    In its 2006 Form 10-K, CFC set forth that "We may experience credit losses due to downward trends in economy and the real estate market" but CFC'S "loans are underwritten in accordance with prescribed guidelines." CFC explained that a significant portion of its portfolio consists of pay-option ARM loans which are different from traditional loans in that there is negative amortization in early years. Nonetheless, CFC affirmed that "we believe our investment criteria have provided us with a high quality investment portfolio and our credit losses should stay within acceptable levels."

165.    In its 2007 Form 10-K, CFC acknowledged that during the latter part of 2007, investor demand for "non-agency mortgage backed securities" (MBS's) abruptly declined. CFC responded by tightening loan programs and underwriting standards. In addition, Defendant CFC stated that most pay option loans (relating to negatively amortizing ARM loans) were underwritten with stated or limited income documentation and that it tightened underwriting standards during 2007.

166.    Contrary to its Form 10-K representations, Defendants originated Subprime Loans to borrowers who did not have the ability to repay the loan, originated higher interest Subprime Loans to borrowers who otherwise qualified for Prime Loans and otherwise engaged in unfair and/or deceptive marketing and/or trade acts or practices.

**XI.    AS A RESULT OF DEFENDANTS' DECEPTIVE SCHEME, PLAINTIFF AND**

**THOUSANDS OF FLORIDA HOMEOWNERS HAVE EITHER LOST THEIR HOMES
OR FACE FORECLOSURE AS THE RATES ON THEIR ADJUSTABLE RATE
MORTGAGES RESET**

167.    Due to Countrywide's lack of meaningful underwriting guidelines and risk-layering, Countrywide's deceptive sales tactics, Countrywide's high-pressure sales environment, and the complex nature of its Pay Option and Hybrid ARMS, a large number of Countrywide loans have ended in default and foreclosure, or are headed in that direction.  Many of its borrowers have lost their homes, or are facing foreclosure, because they cannot afford the payment shock and their properties are too heavily encumbered for them to be able to refinance and pay prepayment penalties.

168.    The national pace of foreclosures is skyrocketing.  Historically, filings in the circuit civil division for the State of Florida have grown on average at a rate of 1% per year.  However, in 2007, circuit civil filings grew by an astonishing 38%, representing an increase of 62,043 filings. The main contributing factor to this increase is the considerable rise in mortgage foreclosures. Real property/mortgage foreclosure filings statewide have nearly doubled from the previous fiscal year.  Below is an illustrative chart.

**Real Property/Mortgage Foreclosure Filings Year Comparison**

| Location** | FY 2005-06 | FY 2006-07 | Percent Change |
|---|---|---|---|
| North Florida | 9,949 | 14,006 | 40.8% |
| Central Florida | 14,499 | 24,982 | 72.3% |
| Southwest Florida | 15,975 | 31,944 | 100.0% |
| Southeast Florida | 9,684 | 24,720 | 155.3% |
| South Florida | 7,165 | 17,188 | 139.9% |
| **State** | **57,272** | **112,840** | **97.0%** |

**North Florida - 1st, 2nd, 3rd, 4th, 8th, and 14th Circuits

Central Florida - 5th, 7th, 9th, and 18th Circuits

Southwest Florida - 6th, 10th, 12th, 13th, and 20th Circuits

Southeast Florida - 15th, 17th, and19th Circuits

South Florida - 11th and 16th Circuits

*Source: Office of the State Courts Administrator, Court Services, 500 S. Duval Street, Tallahassee, FL 32399*

169.    The foreclosure filings in 2008 are even more alarming.  Florida, along with four other states, accounts for approximately 50% of all foreclosure filings in the United States.  Florida filed approximately 30,000 in November of 2008 alone.  With one in every 173

households receiving a foreclosure filing in November of 2008, Florida documented the nation's second highest state foreclosure rate, nearly three times the national average. The national foreclosure rate in the United States is only one in every 519 households. Countrywide mortgages account for a large percentage of these delinquencies and foreclosures.

170.    This may well understate the extent of the crisis facing Florida homeowners with Countrywide mortgages, as more and more Pay Option ARMs go into delinquency. Once the thousands of Pay Option AMRs sold by Countrywide to Plaintiff and Florida borrowers reach their negative amortization cap or otherwise reset to require fully indexed principal and interest payments, which will occur over the next two or three years for many such loans made between 2003 and 2006, the number of such loans in default is likely to skyrocket even above their current high delinquency rate.

171.    Due to Countrywide's lack of meaningful underwriting guidelines and risk-layering, Countrywide's deceptive sales tactics, Countrywide's high-pressure sales environment, and the complex nature of its Pay Option and Hybrid ARMS, a large number of Countrywide loans have ended in default and foreclosure, or are headed in that direction. Many of its borrowers have lost their homes, or are facing foreclosure, because they cannot afford the payment shock and their properties are too heavily encumbered for them to be able to refinance and pay prepayment penalties.  Countrywide's 10-K filed in February, 2008, estimated that as of December 31, 2007, a staggering 27.29% of its non-prime mortgages were delinquent, and theses numbers have only worsened.

172.    To exacerbate the situation even further, Defendants, even though their "front end" lending stores are eager and fully staffed to originate and make mortgage loans, poorly staff their default or "back end" loan servicing departments with minimal personnel, most of which are grossly under qualified for the work or scope of services that the personnel must perform. Furthermore, Plaintiff consistently pursues courses of actions once a loan is in default that will have no mitigating effect of any damages that may result of said defaults, and actually exacerbate or increase the damages that are caused by said defaults to the detriment of Plaintiff and other Florida borrower's.

## COUNT I- VIOLATION OF FLORIDA'S DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT

173.    Plaintiff re-alleges and reaffirms the material allegations contained in Paragraph's 1 through 172 herein.

174.   At all relevant times, Defendants' conduct as alleged herein, the Mortgage Notes and Mortgages were a consumer credit credit contract  governed by Florida's Deceptive and Unfair Trade Practices Act, Florida Statutes, §501, Part II, et. seq.  (FDUTPA).

175.   This is an action against Defendants for violation of FDUPTA for damages in excess of $15,000.00, exclusive of interest, court costs and attorneys fees.

176.   At all relevant times, Plaintiff is an interested consumer as defined within Florida Statutes, §501.203(6)&(7).

176.   At all relevant times, Defendants provided goods or services as defined within Florida Statutes, §501.203(8).

177.   At all relevant times, Defendants solicited consumers as defined within Florida Statutes, §501.203(7).

178.   At all relevant times, Defendants engaged in a trade or commerce as defined within of Florida Statutes, §501.203(8).

179.   At all relevant times, Defendants  conduct as described herein is deceptive and constitutes  unfair methods of competition, unconscionable acts or practices, unfair or deceptive acts or practices in the conduct of any trade or commerce as interpreted by Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1), the federal courts and DUPTA.

180.   At all relevant times, Defendants had actual or constructive knowledge of its conduct as described herein.

181.   At all relevant times, defendant Mozilo had actual or constructive knowledge of its conduct as described herein.

182.   At all relevant times, defendant Sambol had actual or constructive knowledge of its conduct as described herein.

183.   At all relevant times, Defendants engaged in substantial trade and commerce throughout  the  State  of  Florida  of  things  for  value  as  defined  within  Florida Statutes, §501.203(9).

184.   Defendants  violated  DUPTA  in  part  by  representing  to  Plaintiff  that  the Defendants' review of the borrowers' Subprime Loan applications, either expressly or implied, was done in accordance with underwriting standards to confirm that the borrowers were able to repay the loans pursuant to its terms.

185.   Defendants  violated  DUPTA  in  part  by  representing  to  Plaintiff  that  the Defendants' approval of the borrowers' Subprime Loan applications, either expressly or implied, confirmed that the borrowers were able to repay the loans pursuant to its terms.

186.    Defendants violated DUPTA in part by representing to borrowers that the Defendants' closing and funding of the borrowers' Subprime Loan mortgages, either expressly or implied, confirmed that the borrowers were able to repay the loans pursuant to its terms.

187.    Defendants violated DUPTA in part by representing, either expressly or implied, to Plaintiff that the Defendants exercised due diligence in the underwriting, approval, closing and funding borrowers' Subprime Loan applications and mortgages.

188.    Defendants violated DUPTA in part by making or disseminating untrue or misleading statements, or by causing untrue or misleading statements to be made or disseminated, in Florida and Hillsborough County, with the intent to induce Plaintiff and members of the public to enter into mortgage loan or home equity line of credit transactions secured by their primary residences. These untrue and misleading statements include but are not necessarily limited to:

a.    Statements that Countrywide was a mortgage loan expert that could be trusted to help borrowers obtain mortgage loans that were appropriate to their financial circumstances, as described in paragraphs 110 through 115, above;

b.    Statements regarding the terms and payment obligations of Pay Option ARMs offered by Countrywide, including statements that the initial payment rate was the interest rate, statements regarding the duration of the initial payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans, as described in paragraphs 60 through 66, 120 through 129, above;

c.    Statements regarding the terms and payment obligations of Hybrid ARMs offered by Countrywide, including statements regarding the duration of the initial interest-only payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans, as described in paragraphs 77 through 79, 119, and 120 through 129, above;

d.    Statements that borrowers with Pay Option and Hybrid ARMs offered by Countrywide would be able to refinance the mortgage loans before the interest rates reset, when in fact they most likely could not, as described in paragraphs 64, 79, and 130 through 133, above;

e.    Statements regarding prepayment penalties on Pay Option and Hybrid ARMs offered by Countrywide, including statements that the mortgage loans did not have prepayment penalties, when in fact they did, and statements that prepayment penalties could be waived, when in fact they could not, as described in paragraphs 65, 66, 78, and 132 through 133, above;

f.    Statements regarding the benefits or advisability of refinancing mortgage loans with Pay Option and Hybrid ARMs offered by Countrywide, as described in paragraphs 112 through 119, above; and

g. Statements regarding the costs of reduced or no documentation mortgage loans, as described in paragraph 134, above;

h. Statements regarding the existence of prepayment penalties on mortgage loans being refinanced with Countrywide mortgage loans, as described in paragraph 118 and 119, above.

i. Creating and maintaining a deceptive scheme to mass produce loans for sale on the secondary market, as described in paragraphs 19 through 166, above;

j. Soliciting Plaintiff to refinance mortgage loans by misrepresenting the benefits of doing so or by misrepresenting or obfuscating the fact that in doing so the borrowers will incur a prepayment penalty, as described in paragraphs 112 through 119, above;

k. Statements regarding the terms and payment obligations of HELOCs, as described in paragraphs 135 through 136, above;

l. Making mortgage loans and extending HELOCs without regarding to whether borrowers would be able to afford monthly payments on those loans or HELOCs after the expiration of the initial interest rates on the mortgage loans, or the draw periods on the HELOCs, as described in paragraphs 87 through 108, above;

m. Aiding and abetting the breach of the fiduciary duty owed by mortgage brokers to Florida borrowers, as described in paragraphs 151 through 158, above;

n. Failing to provide borrowers with documents sufficient to inform them of their payment obligations with respect to fully drawn HELOCs, as described in paragraphs 83 through 86, above; and

o. Paying compensation to mortgage brokers that was not reasonably related to the value of the brokerage services they performed, as described in paragraphs 153 through 156, above.

189. Defendants violated DUPTA in part by not adhering to its underwriting standards, allowed the origination of "non documentation or reduced documentation" Subprime Loans and failed to ensure that borrowers had sufficient capacity to repay such mortgage loans.

190. Defendants violated DUPTA in part by not adhering to its underwriting standards for "no documentation or reduced documentation loans" to Subprime borrowers by waiving standards, irrespective of the borrowers' ability to document income and assets.

191. Defendants violated DUPTA in part by not adhering to its underwriting standards in regard to the borrower's capacity to repay engendered fraud as such "no documentation or reduced documentation" Subprime Loans were approved for borrowers who were not qualified and could not afford such loans.

192.    Defendants violated DUPTA in part by fostering a culture of loan approvals regardless of the Plaintiff's capacity to pay, Defendants compensated its underwriters with bonuses.  Defendants' underwriters, therefore, had incentives to approve as many loans as possible, regardless of credit risk.

193.    Defendants violated DUPTA in part by not having procedures or rigid guidelines on how "no documentation or reduced documentation" Subprime Loans were to be approved.  It was the underwriters' responsibility to make the loan work, regardless of whether or not the loan fit the professed underwriting standards.

194.    Defendants violated DUPTA in part by making loans to Plaintiff when they knew or should have known that Plaintiff would not be able to repay the loan once the initial ARM period expired.

195.    Defendants violated DUPTA in part by failing to adhere to its own Subprime Technical Manual which sets forth that underwriters should determine for every loan application whether the loan makes sense.  In practice, the Defendants created and/or permitted a culture where its own underwriters were threatened with termination for attempting to verify a Plaintiff's ability to pay, or otherwise impeding loan approval.

196.    Defendants violated DUPTA in part by failing to adhere to its own Subprime Technical Manual which sets forth that "no loan will be made that benefits only the third party originator and/or Countrywide (e.g. origination fees/charges collected)."  Notwithstanding this stated policy, Defendants failed to afford Plaintiff the opportunity to avail themselves of alternative loan options, certain of which carried lower rates of interest.  Thus, Defendants made Subprime Loans to Plaintiff when they knew or should have known that Plaintiffe qualified for alternate loans at lower rates of interest.

197.    Defendants violated DUPTA in part by fostering a culture and/or permitted by the Defendants encouraging managers to approve Subprime Loan applications that were initially denied by underwriters who suspected fraud.

198.    Defendants violated DUPTA in part by furthering its policy to place the generation of consumer loans (and maximization of its profits) above concerns about Plaintiff's ability to meet their loan obligations, Defendants made material misrepresentations to consumers relating to its ARM's by:

      a.    Misrepresenting the amount of time the initial "fixed" interests rates would be in effect;

      b.    Misrepresenting that the interest rates on the loans were "fixed" when that was not the case;

41

      c.  Misrepresenting the manner and degree in which payments would increase subsequent to the termination of the initial fixed rate period; and/or

      d.  Employing and advertising extremely low "teaser" rates while not properly disclosing that these rates would dramatically increase, resulting in monthly payments which were beyond the capacity for consumers to meet, given the financial/income information provided by these consumers to the Defendants.

199.     Defendants violated DUPTA in part by misrepresenting directly and/or hiding and/or not sufficiently disclosing material loan terms to Plaintiff prior to the closing of the loans.

200.     Defendants violated DUPTA in part by employing deceptive marketing practices in an attempt to influence and steer an unwary Plaintiff toward the purchase of risky and costly mortgages and home loans.

201.     Defendants' Subprime Technical Manual sets forth that "no loan will be made that benefits only the third party originator and/or Countrywide (e.g. origination fees/charges collected)." Notwithstanding this stated policy, Defendants failed to afford borrowers the opportunity to avail themselves of alternative loan options, certain of which carried lower rates of interest. Thus, Defendants made Subprime Loans to borrowers when they knew or should have known that the borrowers were qualified for alternate loans at lower rates of interest.

202.     Defendants violated DUPTA in part by inducing the Plaintiff into a transaction that did not and could not meet normal underwriting standards for a residential mortgage. Defendants posed as a conventional mortgage lender thus leading Plaintiff to reasonably believe that the Defendants, the mortgage broker, and the loan originator had an interest in the success( repayment of the loan) of the

transaction that Plaintiff was induced to believe was being executed at the time of the "closing" of the subject loan transaction.   In fact, the Defendants, mortgage broker, appraiser, loan originator, title agent, escrow agent and Trustee on the Deed of Trust, had no financial stake (i.e., liability) in the transaction and no interest other than obtaining Plaintiff's signature on a "loan" that could never be repaid, contrary to representations and assurances from the conspiring participants in this fraudulent scheme. In fact, the "Appraisal" was intentionally and knowingly inflated along with other loan data to justify the closing of the "loan transaction."

203.     Defendants violated DUPTA in part by, without the knowledge of the Plaintiff, entering into Assignment and Assumption Agreements with one or more parties and Pooling and Service Agreements with one or more parties including but not limited to the mortgage aggregator prior to or contemporaneously with the "Closing" of the subject "loan transaction."

204     Defendants violated DUPTA in part by not being the source of the closing funds, nor the true lender contrary to the documents presented before and during the "closing" of the "loan transaction."

205.    Defendants violated DUPTA in part by carrying on an undisclosed hidden illegal scheme to issue unregulated securities (mortgage backed securities) based upon the negotiation of non-negotiable notes, the terms of which had been changed, altered, amended or modified after the execution by the Plaintiff.  Defendants then purported to "negotiate" the note by adding terms which allowed the proceeds of the note to be allocated to the payment of the notes of other borrowers and adding co-obligors as aforesaid through insurance, guarantees, additional collateralization and reserves all of which were undisclosed, as aforesaid.  The note was not negotiable because it was no longer an unconditional promise to pay by the original borrower. The terms had changed, adding conditions to payment that were inherent in the "securitization process" that Defendants fraudulently promoted.

206.    Defendants violated DUPTA in part by the unreported repurchases of certificates or classes of certificates that would and did result in a profit to the underlying securities that went unreported, and which was not credited to Plaintiff where the repurchase was, as was usually the case, far less than the original investment.

207.    Defendants knew, or by the exercise of reasonable care should have known, that all such statements as alleged in this Count I were untrue or misleading at the time they were made.

208.    As a direct and proximate result of Defendants conduct, Plaintiff suffered reasonable, foreseeable and justifiable harm.

209.    Plaintiff  is (a) is entitled to collect its attorney's fees and costs pursuant to Florida Statutes, §501.2105; (b) has retained the law firm of Stamatakis & Thalji, P.L. in this action; and (c) is obligated to pay the law firm of Stamatakis & Thalji, P.L. a reasonable fee for its services in bringing or defending in this case, as well as all costs of collections.

## COUNT II-INTENTIONAL FRAUDULENT MISREPRESENTATION AND IDUCEMENT

210.    Plaintiff re-alleges and reaffirms the material allegations contained in Paragraph's 1 through 209 herein.

211.    This is an action against Defendants for intentional fraudulent misrepresentation and inducement for damages in excess of $15,000.00, exclusive of interest, court costs and attorneys fees.

212.    Defendants knowingly and intentionally concealed material information from Plaintiff which is required by Federal Statutes and Regulations to be disclosed to the Plaintiff both before and at the closing. Defendant or its agents further intentionally or negligently misrepresented facts and circumstances surrounding the closing of the mortgage(s) sued upon in order to induce Defendant to rely upon the same. Such misrepresentations include, but are not limited to, the allegations as alleged in Paragraph number 20 (a)-(f) and 24 (a)-(f) herein.

213.    Defendants also materially misrepresented material information to the Plaintiff with actual knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

214.    Under the circumstances, the material omissions and material misrepresentations of the Defendants were malicious.

215.    Plaintiff, not being an investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender, reasonably relied upon the representations of the Defendants in agreeing to execute the Mortgage Notes and Mortgages and other loan documents.

216.    Had Plaintiff known of the falsity of Defendants' representations, Plaintiff would not have entered into the transactions the subject of this action.

217.    As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiff have suffered damages.

218.    The misrepresentations made by Defendants or their agents to Plaintiff were made for the purpose of inducing Plaintiff to enter into the Mortgage Notes and Mortgages, and were known by Defendants or their agents to be false at the time such representations were made, and Plaintiff reasonably relied upon such misrepresentations to its detriment.

219.    As a direct and proximate result of Defendants conduct, Plaintiff suffered reasonable, foreseeable and justifiable harm.

220.    Plaintiff is (a) is entitled to collect its attorney's fees and costs pursuant to underlying Mortgage Notes and Mortgages; (b) has retained the law firm of Stamatakis & Thalji, P.L. in this action; and (c) is obligated to pay the law firm of Stamatakis & Thalji, P.L. a reasonable fee for its services in bringing or defending in this case, as well as all costs of collections.

## COUNT III-NEGLIGENT FRAUDULENT MISREPRESENTATION AND INDUCEMENT

221.    Plaintiff re-alleges and reaffirms the material allegations contained in Paragraph's 1 through 209 herein.

222.    This is an action against Defendants for negligent fraudulent misrepresentation and inducement for damages in excess of $15,000.00, exclusive of interest, court costs and attorneys fees.

223.    Defendants knowingly and intentionally concealed material information from Plaintiff which is required by Federal Statutes and Regulations to be disclosed to the Plaintiff both before and at the closing. Defendant or its agents further intentionally or negligently misrepresented facts and circumstances surrounding the closing of the mortgage(s) sued upon in order to induce Defendant to rely upon the same. Such misrepresentations include, but are not limited to, the allegations as alleged in Paragraph number 20 (a)-(f) and 24 (a)-(f) herein.

224.    Defendants also materially misrepresented material information to the Plaintiff with constructive knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

225.    Under the circumstances, the material omissions and material misrepresentations of the Defendants were malicious.

226.    Plaintiff, not being an investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender, reasonably relied upon the representations of the Defendants in agreeing to execute the Mortgage Notes and Mortgages and other loan documents.

227.    Had Plaintiff known of the falsity of Defendants' representations, Plaintiff would not have entered into the transactions the subject of this action.

228.    As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiff have suffered damages.

229.    The misrepresentations made by Defendants or their agents to Plaintiff were made for the purpose of inducing Plaintiff to enter into the Mortgage Notes and Mortgages, and were known, or should have been known, by Defendants or their agents to be false at the time such representations were made, and Plaintiff reasonably relied upon such misrepresentations to its detriment.

230.    As a direct and proximate result of Defendants conduct, Plaintiff suffered reasonable, foreseeable and justifiable harm.

231.    Plaintiff is (a) is entitled to collect its attorney's fees and costs pursuant to underlying Mortgage Notes and Mortgages; (b) has retained the law firm of Stamatakis & Thalji, P.L. in this action; and (c) is obligated to pay the law firm of Stamatakis & Thalji, P.L. a reasonable fee for its services in bringing or defending in this case, as well as all costs of collections.

## COUNT IV- BREACH OF FIDUCIARY DUTY

232.     Plaintiff re-alleges and reaffirms the material allegations contained in Paragraph's 1 through 209 herein.

233.     This is an action against Defendants for breach of fiduciary duty for damages in excess of $15,000.00, exclusive of interest, court costs and attorneys fees.

234.     Defendants, by their actions in contracting to provide mortgage loan services and a loan program to Plaintiff which was not only to be best suited to the Plaintiff given their income and expenses but by which Plaintiff would also be able to satisfy their obligations without risk of losing their home, were "fiduciaries" in which Plaintiff reposed trust and confidence, especially given that Plaintiff were not and are not investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

235.     As an alleged trusted financial expert, Plaintiff reasonably placed its confidence and trust into Defendants, and Defendants acquired accepted said trust and confidence and acted upon it to the harm and detriment of Plaintiff. Plaintiff was dependent on Defendants financial expertise, and Defendants agreed to undertake advising and counseling Plaintiff in the loan transaction. Defendants breached their fiduciary duties to the Plaintiff by fraudulently inducing Plaintiff to enter into a mortgage transaction which was contrary to the Plaintiff 's stated intentions; contrary to the Plaintiff 's interests; and contrary to the Plaintiff's preservation of their home.

236.     Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with a callous and with reckless disregard for the rights of the Plaintiff.

237.     Defendants knew, or by the exercise of reasonable care should have known, that all such statements as alleged in this Count III were untrue or misleading at the time they were made.

238.     As a direct and proximate result of Defendants conduct, Plaintiff suffered reasonable, foreseeable and justifiable harm.

239.     Plaintiff is (a) is entitled to collect its attorney's fees and costs pursuant to underlying Mortgage Notes and Mortgages; (b) has retained the law firm of Stamatakis & Thalji, P.L. in this action; and (c) is obligated to pay the law firm of Stamatakis & Thalji, P.L. a reasonable fee for its services in bringing or defending in this case, as well as all costs of collections.

## COUNT V- INVASION OF PRIVACY

240.     Plaintiff re-alleges and reaffirms the material allegations contained in Paragraph's 1 through 209 herein.

46

241.     This is an action against Defendants for invasion of privacy for damages in excess of $15,000.00, exclusive of interest, court costs and attorneys fees.

242.     Defendants or their agents targeted and gathered private information about Plaintiff such including information such as name, age, race, sex, religion, credit history, income level, employment, taxes, equity and investments, income tax and familial relationships, and acquired and appropriated such information for Defendants own benefit, and did so by invading Plaintiff's private residence, workplace, motor vehicle, school and/or church with telephone calls, television commercials, radio ads and mail.

243.     Plaintiff did not know or was unaware of Defendants intrusion and gave no authority, implicit or explicit, to do so.

244.     Defendants or its agents targeted and gathered private information to further its efforts of stalking Plaintiff to borrow money and rob Plaintiff of money and wealth.

245.     Defendants then disclosed Plaintiff's private information in the public records and to third parties, and such disclosure was objectionable to a reasonable person. Furthermore Defendants resale of the Mortgage Notes and Mortgages using Plaintiff 's identity, credit score and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme further disclosed Plaintiff's private information in the public records and to third parties.

246.     Defendants disclosure of Plaintiff's private information has placed Plaintiff in a false light in the public and third parties.

247.     Defendants knew or should have known that such intrusion and disclosure is objectionable to Plaintiff.

248.     As a direct and proximate result of Defendants conduct, Plaintiff suffered reasonable, foreseeable and justifiable harm.

249.     Defendant is (a) is entitled to collect its attorney's fees and costs pursuant to underlying Mortgage Notes and Mortgages; (b) has retained the law firm of Stamatakis & Thalji, P.L. in this action; and (c) is obligated to pay the law firm of Stamatakis & Thalji, P.L. a reasonable fee for its services in bringing or defending in this case, as well as all costs of collections.

## COUNT VI-UNJUST ENRICHMENT

250.     Plaintiff re-alleges and reaffirms the material allegations contained in Paragraph's 1 through 209 herein.

251.     This is an action against Defendants for unjust enrichment for damages in excess of $15,000.00, exclusive of interest, court costs and attorneys fees.

252.     This is an equitable action with no adequate remedy at law.

47

253.    Plaintiff had an implied contract with the Defendants to ensure that Plaintiff understood all fees which would be paid to the Defendants to obtain credit on Plaintiff 's behalf and to not charge any fees which were not related to the settlement of the loan and without full disclosure to Plaintiff.

254.    Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains from the closing transaction (including but not limited to from resale of the Mortgage Notes and Mortgages using Plaintiff 's identity, credit score and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme).

255.    Defendants have been unjustly enriched at the expense of the Plaintiff, and maintenance of the enrichment would be contrary to the rules and principles of equity.

256.    Defendants have also been additionally enriched through the receipt of payment of moneys and/or other things of value from third parties including but not limited to investors, insurers, other borrowers, the United States Department of the Treasury, the United States Federal Reserve, and Bank of America, N.A.

257.    Plaintiff thus demands restitution from the Defendants in the form of actual damages, exemplary damages, and attorneys' fees.

258.    As a direct and proximate result of Defendants conduct, Plaintiff suffered reasonable, foreseeable and justifiable harm.

259.    Plaintiff is (a) is entitled to collect its attorney's fees and costs as part of its damage claim; (b) has retained the law firm of Stamatakis & Thalji, P.L. in this action; and (c) is obligated to pay the law firm of Stamatakis & Thalji, P.L. a reasonable fee for its services in bringing or defending in this case, as well as all costs of collections.

## DEMAND FOR JURY TRIAL

260.    Defendant hereby requests a trial by jury on all issues so triable.

WHEREFORE, Plaintiff prays that this Honorable Court take jurisdiction of this case; award Plaintiff statutory and/or actual damages in an amount to be established at trial, including prejudgment interest on all amounts, court costs and reasonable attorney fees; rescind the transaction and order Defendants to take all action necessary to terminate any of its security interest in Plaintiff's property created under the loan transaction and declare all such security interests void, including but not limited to the mortgage related to the transaction; order the return to Plaintiff any money or property given by Plaintiff to anyone in connection with the transaction; enjoin Defendant during this action and permanently thereafter from instituting prosecuting or maintaining foreclosure proceedings upon Plaintiff's property, or from recording any deeds or

mortgages on the property or from otherwise taking steps to defraud Plaintiff's ownership of its

property; order that the right to retain proceeds vests in Plaintiff; grant a trial by jury on all issues

so triable; and grant such other relief as this Court deems just and proper under the circumstances.

Respectfully Submitted by:

By:_____

Scott D. Stamatakis, Esquire
Florida Bar No.:178454
Sami Thalji, Esquire
Florida Bar No.:165913
STAMATAKIS & THALJI, P.L
P.O. Box 341499
Tampa, Florida 33694
(813) 282-9330 (telephone)
(813) 282-8448 (facsimile)
Trial Attorneys for Plaintiff